**Jorge BUCIO, Petitioner,**

v.

**Marci SUTHERLAND, Superintendent, Respondent.**

No. 1:08–cv–00118.

United States District Court, S.D. Ohio, Western Division.

Dec. 4, 2009.

Jill E. Beeler, Jill Eileen Stone, Ohio Public Defender's Office, Columbus, OH, for Petitioner.

## OPINION AND ORDER

S. ARTHUR SPIEGEL, Senior District Judge.

This matter is before the Court on Magistrate Judge Black's August 27, 2009 Report and Recommendation (doc. 23) and each of Petitioner's and Respondent's objections thereto (docs. 26 and 27, respectively). For the reasons indicated herein, the Court ADOPTS and AFFIRMS the Magistrate Judge's Report and Recommendation in its entirety and GRANTS Petitioner's writ of habeas corpus on Grounds Two and Six.

### I. Background

The Magistrate Judge's Report and Recommendation is extremely thorough, both in its presentation of the facts and its analysis of the record and the law. Consequently, the Court will merely present a brief summary of the case to contextualize the Court's opinion. In brief, this case involves the following facts, taken from the Magistrate Judge's Report and Recom-

mendation (doc. 23). In June of 2003, Petitioner Jorge Bucio ("Petitioner" or "Bucio"), age thirteen at the time, was left alone by his mother to care for his four younger siblings, then aged ten years, three years, two years and thirteen months (*Id.*). At some point that night, Bucio told his ten-year-old brother that something was wrong with the baby (*Id.*). The ten-year-old performed CPR when it was apparent that the baby was not breathing (*Id.*). The baby was nonresponsive, and, unable to find the phone, the children laid the baby on the couch and prayed until their mother returned, at which point emergency services were notified (*Id.*). The baby was transported to the hospital with his mother, where he later died, while Bucio and his three other siblings were taken to the police station (*Id.*). The police questioned Bucio first, and he initially told the detective that the baby had fallen down the stairs; upon learning that his brother had died, Bucio told the detective that he had struck the baby with a metal bar and choked him around the neck (*Id.*). After hearing that story, the detective read Bucio his *Miranda* rights and Bucio signed a statement reflecting the story (*Id.*).

Bucio was indicted by grand jury of one count of felony murder and one count of child endangerment (*Id.*). The grand jury also found Bucio age-eligible for disposition as a "serious youthful offender," and, after Bucio was subsequently found guilty of both counts, the juvenile court ordered a "blended sentence," meaning that Bucio was committed to the Ohio Department of Youth Services ("ODYS") until the age of twenty-one, and given an adult sentence of fifteen-years-to-life for murder with an additional two years for child endangerment, the adult sentence being stayed pending the successful completion of the juvenile sentence (*Id.*).

Having exhausted his state appeals and attempts for post-conviction relief, Bucio filed the instant petition for writ of habeas corpus, which set forth six grounds for relief, three of which he subsequently voluntarily dismissed (*Id.*). Before the Court, therefore, are the following three grounds:

Ground Two: Petitioner was denied his right against self-incrimination;

Ground Four: Petitioner was denied due process of law and trial by jury because the trial court made certain mandatory statutory findings before imposing a sentence greater than the maximum term authorized by the jury verdict, in violation of the Sixth and Fourteenth Amendments to the United States Constitution; and

Ground Six: Petitioner was denied effective assistance of trial counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution (*Id.*).

## II. The Magistrate Judge's Report and Recommendation

A brief summary of the Magistrate Judge's Report and Recommendation follows.

### A. Ground Two

Petitioner's claim that he was denied his right against self-incrimination in violation of the Fifth and Fourteenth Amendments to the United States Constitution is grounded in his assertion that his initial oral statement was given while in custody, in response to interrogation, and prior to being provided the required *Miranda* warnings (*Id.*). Petitioner further claims that his second, written statement was the product of the unlawfully coerced first oral statement and was not voluntarily given (*Id.*).

The Magistrate Judge undertook a thorough analysis of the record and the rele-

vant body of law that has fleshed out *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He correctly observed that the relevant inquiry with respect to this asserted ground contains four overarching questions: whether Bucio was in custody; whether he was interrogated while in custody; whether the second statement was tainted by the first; and whether, if the first three are answered affirmatively, the introduction of Bucio's confessions amounted to harmless error (doc. 23).

### 1. Whether Bucio was in Custody

The Magistrate Judge noted that the state court of appeals found that Bucio was not in custody when he made his initial statements to the detective the night of his brother's death because he was not put under formal arrest; he was taken to the police station as a potential witness and was not allowed to leave for his own protection; the interview took place not in an interrogation room but at a desk and there were no "restrictive elements" to the interview; and the detective was merely trying to glean information about the incident from Bucio, and Bucio was free to stop talking to the detective at any time (*Id.*). However, the Magistrate Judge found that these factors relied upon by the state court do not support the conclusion that the state's decision was reasonable (*Id.*). Instead, for example, the Magistrate Judge found the detective's assertion that Bucio was taken to the station and kept there for his own protection to be a subjective reason that should not be used to determine whether, objectively, a thirteen year-old being questioned by a detective at 3:00 in the morning at the police station would feel free to leave (*Id.*). Similarly, the Magistrate Judge found that the state court's reliance on the fact that the interview took place in the detective's office, not the interrogation room, was misplaced because "the questioning still occurred in a police-dominated atmosphere apart from petitioner's siblings, parent, or any other supportive third-party" (*Id.*).

In addition, the Magistrate Judge found that the state court "ignored numerous objective factors which, under Supreme Court precedent, point to the conclusion that [Bucio] was in custody at the time he gave his initial statement implicating himself in his brother's death" (*Id.*). Specifically, the Magistrate Judge pointed to the following facts, which, under the totality of the circumstances, would lead a reasonable person in Bucio's position to conclude he was not free to leave: Bucio did not appear at the station voluntarily; his parents were not contacted prior to the questioning, and Bucio was alone with the detective for his questioning; Bucio was not offered a break and not informed that he could refuse to answer the detective's questions; Bucio was separated from his siblings and parent and questioned for approximately forty minutes before giving incriminating statements; he was not told he was free to leave and, in fact, he was not free to leave; and he was not released after questioning but placed under arrest (*Id.*). Because the factors relied upon by the state court could not reasonably support a finding of non-custody, and because other factors support the conclusion that a reasonable person in Bucio's situation would not have felt free to leave at will, the Magistrate Judge found that the state court's decision that Bucio was not in custody was an unreasonable application of federal law (*Id.*).

### 2. Whether Bucio was Interrogated

Because the state court, having decided that Bucio was not in custody, never reached the question of whether he was subjected to interrogation, the Magistrate Judge reviewed the issue de novo and found that Bucio was so subjected (*Id.*).

### 3. Whether the Second Statement was Tainted by the First

While Bucio's initial statement was obtained in violation of his constitutional

rights, the Magistrate Judge determined, Bucio did give a second oral and written statement after he was given the *Miranda* warnings, which raises the question of whether the *Miranda* warnings given before the second statement cure the ills of the un-warned first statement (*Id.*). The Magistrate Judge correctly noted that the issue of tainted second confessions hinges on certain key questions, including whether the first statement was made voluntarily and whether a question-first-warn-later interrogation technique was used (*Id.*, citing to *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) and *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)).

Regarding the voluntariness of Bucio's first statement, the Magistrate Judge found that, under the totality of the circumstances, the statement cannot be found to be voluntary (*Id.*, citing, among others, *Elstad*, 470 U.S. at 318, 105 S.Ct. 1285; *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948)). The Magistrate Judge noted that the factors courts must look to for indicia of voluntariness include the age, education and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep (*Id.*, citing, among others, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Here, Bucio did not go to the station voluntarily; he was only thirteen years old at the time; he had limited intellectual abilities and limited schooling and had an IQ in the borderline mental retardation range, functioning at the moderately retarded range in his reasoning and judgment ability; the detective repeatedly questioned Bucio's truthfulness with no parent or other supportive adult present; and the questioning took place in the early morning hours, with Bucio never having been told that he did not have to

answer the detective's questions (*Id.*). Given the totality of the circumstances, the Magistrate Judge found that Bucio's statement could not be found voluntarily given and that no curative measures had been taken (*Id.*).

With respect to the question-first, warn-later approach, the Magistrate Judge noted that courts are to be guided by five factors when assessing whether *Miranda* warnings given between statements can be effective at removing the taint of an un-warned first statement on a warned second statement (*Id.*, citing *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601, plurality opinion). These factors are: the completeness and detail involved in the first round of questioning; the overlapping content of the statements made before and after the warning; the timing and setting of the interrogation; the continuity of police personnel during the interrogation; and the degree to which the interrogator's questions treated the second round as continuous with the first (*Id.*). Analyzing the instant case through the lens of these factors, the Magistrate Judge found that the mid-statement *Miranda* warning was not effective in removing the taint of the first statement on the second (*Id.*).

Consequently, the Magistrate Judge found that the state court's admission of Bucio's statements was contrary to clearly established federal law (*Id.*).

### 4. Whether the Introduction of the Statements was Harmless Error

Because Bucio's statements were directly inculpatory and admitted to prove essential elements of the state's case, not cumulative of other evidence, and critical to the establishment of *mens rea* for the child endangerment charge, upon which the felony-murder conviction was based, the Magistrate Judge found that the introduction of the statements was not harmless error (*Id.*).

## 5. Remedy

The Magistrate Judge, having found that the state court acted contrary to clearly established federal law when it admitted Bucio's statements and having further found that such admission was not harmless, recommended that Bucio's petition for writ of habeas corpus be granted and that Bucio be released from custody unless he is granted a new trial within a time frame fixed by the Court (*Id.*).

## B. Ground Four

In Ground Four of his petition, Bucio claims that he was denied due process because the trial court imposed a blended sentence based on judicial fact-finding, fact-finding which, Bucio asserts, should have been conducted by a jury (*Id.*). Bucio analogized his situation to Supreme Court cases in which the Court found that, when sentencing adults to terms longer than the statutory maximum, judges cannot rely on facts not found by a jury (*Id.*, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)). The Magistrate Judge, however, was persuaded by a recent Ohio Supreme Court case that confronted and denied a similar constitutional challenge to the serious youthful offender statute that authorizes a blended sentence like the one Bucio received (*Id.*, citing *State v. D.H.*, 120 Ohio St.3d 540, 901 N.E.2d 209 (2009)). Specifically, the Magistrate Judge found that the policy underpinnings of the juvenile system-primarily that rehabilitation be the goal-distinguish juvenile sentences from adult sentences such that the Constitutional protections identified in *Apprendi* and *Blakely* are not applicable in the juvenile setting, even with a blended sentence (*Id.*).

Consequently, the Magistrate Judge recommended that Bucio not be granted a writ of habeas corpus on Ground Four, but that, because reasonable jurists would find it debatable whether the decision could have come out differently, a certificate of appealability should issue (*Id.*, citing *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

## C. Ground Six

Bucio's claim that he was denied effective assistance of counsel has two distinct factual bases: Bucio asserts first that his counsel was ineffective when he refused a plea offer without first presenting it to Bucio and second that his counsel was ineffective when he failed to consult with and seek testimony of an expert regarding the cause of death (*Id.*).

### 1. The Plea Offer

The Magistrate Judge determined first that Bucio's claim regarding the plea offer was not procedurally barred because it fit within relevant exceptions to the *res judicata* bar for ineffective assistance claims raised in post-conviction relief petitions (*Id.*). In short, the Magistrate Judge found that Bucio had presented competent and credible evidence that his trial counsel did, in fact, fail to present a valid plea offer to Bucio, which failure was prejudicial to Bucio (*Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Under these circumstances, the Magistrate Judge recommended that the proper remedy is to reinstate the plea offer and that Bucio should be given an opportunity to accept such offer and be sentenced according to its terms (*Id.*).[1]

### 2. The Expert

The Magistrate Judge found that Bucio's counsel's failure to consult with an

---

1. According to the affidavit of Bucio's Guardian ad Litem, the offer allowed Bucio to plead

guilty to an F–2 involuntary manslaughter

expert regarding the coroner's testimony and the cause of death was likely deficient (*Id.*). However, he also found that the record did not provide sufficient evidence to permit him to determine whether counsel's failure to call such an expert was a matter of "sound trial strategy" or, instead, a violation of counsel's duty to conduct a reasonable, diligent investigation of the case (*Id.*). The Magistrate Judge noted that if Bucio's trial counsel had consulted with an expert witness like the one consulted by his appellate counsel, who opined that the real cause of death was poorly administered CPR and that the contusions and other injuries were similarly the result of the CPR and not a metal bar or choking, and had such testimony been presented to the jury, the outcome of the case would likely have been quite different (*Id.*). The state courts did not afford Bucio an evidentiary hearing on this issue (*Id.*).

Therefore, in order to flesh out the facts underlying this claim so that the Court may properly adjudicate it, the Magistrate Judge recommended that the Court hold an evidentiary hearing wherein the state and Bucio's counsel could respond to Bucio's evidence supporting his claim that his trial counsel was ineffective in failing to investigate and secure expert testimony regarding the cause of death (*Id.*).

### III. Petitioner's Objections

Bucio objects to the Magistrate Judge's decision with respect to Ground Four and

argues that the state courts and the Magistrate Judge have misread Ohio's serious youthful offender statute, and, correctly read, it is unconstitutional (doc. 26).

Citing to both *Apprendi* and *Blakely*, Bucio argues that the rehabilitative goals undergirding the juvenile justice system do not sufficiently distinguish the judicial fact-finding permitted by the Ohio serious youthful offender statute from the jury factfinding required for adults such that the constitutional guarantees afforded adults should be unavailable for juveniles (*Id.*). Bucio contends that the Magistrate Judge and the state courts have failed to appreciate the difference between the discretionary and the mandatory components of the Ohio serious youthful offender statute, and that a recognition of the difference leads to the conclusion that the constitutional safeguards articulated in *Blakely* and *Apprendi* should be applicable to the discretionary component (*Id.*).

Specifically, under certain circumstances, a juvenile may find himself subject to a mandatory blended sentence [2] and, in such a case, either the jury verdict or the juvenile's admission automatically subjects him to both the juvenile portion of the sentence and the adult portion of the sentence (*Id.*, citing O.R.C. § 2152.13(D)(1)). In contrast, when, as here, a juvenile has been found eligible for a *discretionary* serious youthful offender sentence, he can only be given the adult portion of the sentence if the juvenile court makes certain findings (*Id.*, citing O.R.C. § 2152.13(D)(2)(a)(i)). Bucio contends that, under the discretionary regime, vest-

---

and an F–3 child endangerment charge, with an aggregate sentence of eighteen months to twenty-one years of age; notably, the offer included a stipulation that no serious youthful offender designation would obtain, and the case would be taken out of the adult system (*Id.*).

2. For example, if a juvenile is adjudicated a delinquent child for committing an act that would be attempted aggravated murder if committed by an adult, and the juvenile was fourteen or fifteen years old at the time, the serious youthful offender status is mandatory; if he was ten, eleven, twelve or thirteen, it is discretionary. O.R.C. § 2152.11(C)(1) & (2).

ing the judge alone with the power to make the statutory findings necessary to sentence a juvenile as an adult is a violation of the juvenile's Sixth Amendment right to a trial by jury (*Id.*). Bucio argues that the federal protections of the Sixth Amendment should be available, minimally, to juveniles facing blended sentences because such dispositions are not quasi-criminal traditional juvenile court proceedings but, instead, actual criminal prosecutions (*Id.*). Indeed, Bucio argues, because the proceedings and the punishment in the blended sentencing context mimic those in the criminal trial context, no rational reason exists for affording adults in the latter context rights but denying the same rights to juveniles in the former (*Id.*).

In the alternative, Bucio argues that even if the Sixth Amendment rights do not apply in the blended sentencing context, Ohio's blended sentencing scheme is violative of the fundamental fairness principles inherent in the Due Process Clause of the U.S. Constitution because the scheme relies on a flawed premise: the rationale behind the scheme is that the juvenile has the power to decide whether he will serve the adult time-either he performs his juvenile sentence without incident or he does not-but the system is so profoundly dysfunctional that successful rehabilitation is simply not an option for most juveniles (*Id.*). Relying on the report of a team of experts appointed as part of a class action suit to conduct intensive site visits of various Ohio youth services facilities, Bucio paints a disturbing picture of the Ohio juvenile rehabilitation system as being comprised of facilities that are overcrowded, understaffed, under-served in education, mental health treatment and rehabilitative programming, resulting in the "ingrained" use of needless and excessive force (*Id.*). In such an environment and against such odds, Bucio contends, it is fundamentally unfair to expect a juvenile

to succeed in carrying his burden of rehabilitation (*Id.*).

Bucio therefore asks this Court to reject the Magistrate Judge's recommendation with respect to Ground Four or, in the alternative, to issue a certificate of appealability (*Id.*).

## IV. Respondent's Objections

Respondent objects only to the Magistrate Judge's decision and recommendation regarding Bucio's statements, the facts underlying Bucio's Ground Two (doc. 27). Specifically, Respondent objects to the Magistrate Judge's findings that Bucio was in custody at the time of his questioning and that the first statement tainted the second (*Id.*).

### A. Custody

Respondent contends that the Magistrate Judge's finding that Bucio was in custody is merely reflective of his difference of opinion, not a proper application of the law; the test used to determine whether a defendant is in custody permits courts a great deal of leeway and, while reasonable minds might disagree on the outcome of the test, it cannot be said that the state court's decision was an unreasonable application of clearly established federal law (*Id.*). Specifically, Respondent takes issue with the Magistrate Judge's statement that the state court "ignored" facts that support a finding of custody and contends that the court did not ignore those facts at all; instead, it applied those facts to the law and simply came up with an answer the Magistrate Judge disagreed with (*Id.*).

Respondent then specifically deconstructs each of the facts relied upon by the Magistrate Judge in reaching his conclusion that the state court erred in its custody determination. For example, Respondent contends that to rely on the fact that Bucio did not appear at the police station

voluntarily ignores the realities of the situation because a thirteen year-old would not ordinarily be expected to arrive at the station on his own and his mother, at the hospital with the baby, was not available to bring him in (*Id.*). Similarly, relying on the absence of a parent or other adult during questioning or the fact that Bucio was separated from his siblings ignores the practical realities present-that Bucio's mother was first at the hospital and then under interrogation herself and that it was easier to interview Bucio away from the other children and their presence may have unduly influenced his account of the events (*Id.*, analogizing to *Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, where custody was not found even when juvenile's parents were not allowed in the interview). Respondent specifically takes issue with the Magistrate Judge's failure to cite to the transcript to support his conclusion that "the police never contacted petitioner's parent prior to questioning petitioner," and contends that the record is silent on that point (*Id.*).

Respondent further contends that, while Bucio was not free to leave for his own safety and for the safety of his siblings, the facts that he was not physically restrained and that the officer testified that he would have been free to leave had there been an appropriate adult waiting for him support the state court's finding of non-custody (*Id.*). Although Bucio was never told he was free to leave, Respondent argues that the absence of evidence to show that he was initially told he was under arrest similarly supports the state court's determination (*Id.*). Further, Respondent contends that the Magistrate Judge cites the questioning style of the police [3] as evidence that

a reasonable person would not have felt free to leave, and argues that confronting Bucio with the detective's disbelief was neither belligerent nor inconsistent with *Alvarado* (*Id.*). Finally, Respondent argues that the lateness of the hour and the fact that Bucio was ultimately arrested are facts upon which the Magistrate Judge inappropriately relied because the former was outside the detective's control, and the latter is irrelevant because the correct standard is how a reasonable person would feel during the interview, not after the interview (*Id.*, citing the *Alvarado* dissent, 541 U.S. at 672, 124 S.Ct. 2140).

In conclusion, Respondent argues that the state court considered the circumstances surrounding the interrogation and found that "Bucio was not restrained to the degree associated with a formal arrest," which decision, because of the leeway given courts in their determination of custody, was not an unreasonable application of federal law (*Id.*).

### B. Second Statement

Respondent contends that the police did not deliberately employ methods designed to thwart *Miranda*, making *Seibert* inapplicable, and argues that the proper standard to apply to this case is that set forth in *Elstad*: the post-warning statement is admissible provided it, and the initial unwarned statement, were voluntarily given (*Id.*, citing *Elstad*, 470 U.S. at 314, 105 S.Ct. 1285). Because Bucio's statements were voluntarily given, Respondent contends, the first statement, even if given in violation of *Miranda*, cannot be said to have tainted the second (*Id.*).

---

**3.** The Court notes that Respondent appears to have misread the Magistrate Judge's Report and Recommendation here. While the Magistrate Judge does discuss the questioning style of the detective, he does not do so in the context of custody but, instead, notes it in his discussion of interrogation and describes it in more detail in his analysis of the involuntariness of Bucio's statement (doc. 23).

## V. Discussion & Analysis

If the constitutional issues have been properly adjudicated by the state court, this Court may not issue a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was either (i) contrary to, or involved an unreasonable application of, clearly established Supreme Court law or (ii) based on an unreasonable determination of the facts in light of the evidence presented in the state proceedings. Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA").

The Court addresses the parties' objections here.

### A. Ground Two

#### 1. Bucio was in custody

■ The Court is unpersuaded by Respondent's arguments regarding the state court's decision that Bucio's constitutional rights were not violated when he gave his initial statement without having been provided his *Miranda* warnings. Instead, the Court finds that such a decision involved an unreasonable application of clearly established federal law, as detailed by the Supreme Court.

■ The Court first notes that the question of whether a person is in custody must be approached through the objective lens of how a reasonable person in the suspect's position would understand his situation. *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The overarching question is whether, under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 663, 124 S.Ct. 2140.

Respondent places great emphasis on the Magistrate Judge's use of the word "ignored" with regard to the factors speaking to custody and contends that the state court didn't ignore any factors (doc. 27). Respondent then segregates each fact noted by the Magistrate Judge in his Report and Recommendation, facts that do not appear in the state court's discussion of its finding, and argues against their use to support a finding of custody (*Id.*). Unfortunately, Respondent, like the state court, has missed the forest for the trees.

The Magistrate Judge did say that the state "ignored numerous objective factors which, under Supreme Court precedent, point to the conclusion that petitioner was in custody" (doc. 23). Respondent concedes that the state court did not specifically identify those facts that weigh in favor of a finding of custody and those against, but Respondent argues that there "is nothing in the state court opinion to suggest that the court simply 'ignored' " all of the relevant facts (doc. 27). While the state court need not explicitly detail the minutiae of its weighing process, it must analyze all of the facts present, not as individual, segmented parts, but as a whole. There may be, as Respondent contends, nothing to suggest that the state court ignored relevant facts, but, critically, there is nothing to suggest that it engaged with them. Clearly established federal law, as delineated by the Supreme Court, requires a consideration of the totality of the circumstances in custody determinations, and, as the Magistrate Judge cogently detailed, the state court failed to undertake that consideration. Had it done so, the reasonable application of federal law would have led the state court to a finding of custody.

Bucio was taken into the police station with three of his siblings, without a parent or other adult, in the middle of the night, his baby brother and mother whisked off to the hospital. While Respondent is correct that the lateness of the hour was not the detective's fault, that is a red herring-the lateness of the hour is not a question of

fault; it is, however, a fact that contributes to the totality of the circumstances in which Bucio found himself. While the detective had no control over the timeline of events, he had full control over the course of his interrogation of Bucio and the others involved. The detective had total control over when and how to interrogate Bucio, and he chose to do so at that hour, in that manner, and without a parent, an attorney or another adult present. Respondent claims that Bucio was merely a potential witness and not a suspect, and that he wasn't free to leave for his own protection because of his youth, the neighborhood and the lateness of the hour. Again, this is not relevant. As the Magistrate Judge correctly notes, the detective's assertion to this effect has absolutely no bearing on whether a reasonable person in Bucio's circumstances would have felt free to leave, the only relevant inquiry here. Similarly, under these circumstances, it is not relevant why Bucio was not free to leave. There is no evidence to suggest that the reasons behind his detention were shared with him, which may have alleviated a feeling of custody. After the fact, however, the detective's subjective reasons behind not allowing Bucio to leave are not relevant-the fact remains that, under the totality of the circumstances present here, Bucio was not free to leave. Respondent argues that this somehow leads to the "undesirable conclusion that every time the police prevent a juvenile witness from leaving because a responsible adult is not available, he is considered in custody for purposes of *Miranda*" (doc. 27). Leaving aside whether this is an undesirable conclusion, it is certainly an oversimplification

of the issue and an over-extension of the Court's holding.

Respondent claims that to ascribe any weight to the facts that Bucio did not arrive voluntarily at the station and that his parent wasn't present ignores the facts that he was not of driving age[4] and his mother was either at the hospital or being interrogated herself. Again, like Respondent's argument regarding the lateness of the hour, these arguments are unpersuasive. On the contrary, these facts are critically important as components of the whole, and Respondent's attempts to explain them away fail. It simply does not matter why Bucio didn't arrive voluntarily to the station or why his mother wasn't present for his interrogation-what matters to the question of whether a reasonable person would have felt free to leave is that, in addition to all of the other extant facts, he was forced into a squad car and taken with his siblings to the police station, without a parent or other adult present.

Similarly, Respondent discounts the fact that Bucio was isolated from his siblings and questioned about the events of the night, again without a parent or other adult present, with the justification that it was easier to question him apart from his siblings and they might have influenced his version of events. Again, Respondent attempts to do away with these facts with reasonable motives and explanations. But, again, that is not the point. The reasons underlying the facts presented are not important to whether the person being questioned feels as though he may leave, and, consequently, they are not important to the Court's analysis. Courts are to look at the objective facts as a whole, not the

---

4. The Court notes that Respondent allows for Bucio's age to factor into the analysis of custody here, as well as above, in the detective's reasoning for why Bucio was not free to leave. However, if his age is relevant here then it must be relevant as a fact overall, which unequivocally strengthens a finding of

custody. As the Magistrate Judge noted, given the plurality decision in *Alvarado* and the deferential AEDPA standard, whether a court may properly consider the suspect's age in its determination of custody is the subject of some debate (doc. 23, citing *U.S. v. Panak*, 552 F.3d 462, 471 (6th Cir.2009)).

subjective underpinnings of those facts or the reasons why this fact presented itself instead of another. The ultimate question courts must answer is whether, under the circumstances surrounding the interrogation, a reasonable person would have felt restraint on freedom of movement akin to a formal arrest. *Alvarado*, 541 U.S. at 663, 124 S.Ct. 2140, quoting *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Under the totality of the circumstances present here, a finding of non-custody is simply an unreasonable application of Supreme Court precedent. The justifications provided by Respondent to explain away the facts, facts which as a whole create a scenario in which a reasonable person would not have felt free to leave, are unpersuasive.

## 2. Bucio's second statement was tainted by the first

Respondent objects to the Magistrate Judge's conclusion that Bucio's first, un-warned statement tainted his second, warned statement on the grounds that *Elstad*, not *Seibert*, controls, and the record does not support a finding of an involuntary confession, as *Elstad* requires (doc. 27).[5]

■ Assuming, *arguendo*, that *Elstad* does control, the *Miranda* warnings given subsequent to Bucio's un-warned first statement would remove the taint of that statement, provided the first statement was given voluntarily. *See Oregon v. El-stad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *United States v. Crowder*, 62 F.3d 782, 786 (6th Cir.). Courts are to look at the totality of the circumstances when assessing the voluntariness of a confession, including, for example, the age, education and intelligence of the accused; whether he has been informed of his constitutional rights; the length and extent of the questioning; and the use of the physical punishment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Respondent contends that there was no physical or psychological coercion or mistreatment when the detective first questioned Bucio; that the detective "chatted" with Bucio first, likely "put[ting] the youngster at ease"; that the detective only accused Bucio of lying one time; that it was not a lengthy interview; and that Bucio's limited intellectual abilities did not interfere with his ability to voluntarily give a statement (doc. 27). However, under the totality of the circumstances, Bucio cannot be said to have given a voluntary confession, the "product of an essentially free and unconstrained choice" by him. *See Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041. These circumstances include, *inter alia*, Bucio's youth; the results of the battery of tests administered to assess his intellectual abilities, including the IQ subtests showing that he functions at the moderately retarded range in his reasoning and judgment

---

5. Respondent takes this position, that *Elstad* controls absent evidence that police deliberately used tactics designed to thwart *Miranda*, despite the fact that it is a position held only by Justice Kennedy in his concurrence in the *Seibert* opinion (*Id.*, citing *Seibert*, 542 U.S. at 622, 124 S.Ct. 2601). The Magistrate Judge, however, expertly addressed the difficulties and nuances inherent in applying plurality decisions and noted that Justice Kennedy's rule, that *Elstad* applies absent deliberate police misconduct, has not unequivocally been embraced by the lower courts, including the Sixth Circuit (doc. 23). Among others, the Magistrate Judge cited to *U.S. v. Pacheco-Lopez*, 531 F.3d 420, 426 n. 4 (6th Cir.2008), wherein the court observes that *Seibert*'s plurality opinion should be read as limiting *Elstad's* holding to its facts. However, because the Court finds that the *Miranda* warnings did not suffice to remove the taint of the un-warned first statement on the second statement under any of the three possible approaches (*Elstad*, *Seibert* plurality, or Justice Kennedy's *Seibert* concurrence), the Court need not decide which rule controls here.

ability; that Bucio did not voluntarily arrive at the station; that he had limited education and that English was not his primary language; that he did not have sufficient experience with law enforcement to have been familiar with the process; and that no parent or other adult was present. The circumstances also include, as Respondent correctly notes, the short length of time of the interview and the fact that the detective did not repeatedly and threateningly accuse Bucio of lying.[6] But looking at the situation as a whole, as the Court must, Bucio's confession does not appear to have been the product of a free choice by him; it therefore would fail under *Elstad*.[7]

Respondent's objections under a *Seibert* analysis are likewise unpersuasive. Respondent distinguishes *Seibert* from the instant case on the basis that, unlike in *Seibert*, the detective here did not deliberately employ the question-first, warn-later technique in an attempt to thwart *Miranda* (doc. 27). Of course, as noted above, this is only relevant under Justice Kennedy's concurrence. But, as the Magistrate Judge correctly concluded, whether under Justice Kennedy's opinion or the plurality opinion, the *Miranda* warnings given after the first statement were not effective in removing the taint of the unwarned statement.

Respondent attempts to factually distinguish *Seibert* but this is misguided; *Sei-*

*bert's* plurality provides the lower courts with five specific factors to assess in order to determine whether the late-administered *Miranda* warnings can be effective at accomplishing their objectives, and it is those factors, not factual distinctions, that guide this Court. *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601. Sifting the facts of this case through the sieve of those factors leads the Court to the clear conclusion that the *Miranda* warnings given here were ineffective.

In *Seibert*, the Supreme Court explained that an effective *Miranda* warning would "advise the suspect that he had a real choice about giving an admissible statement at that juncture ... [and] reasonably convey that he could choose to stop talking even if he had talked earlier[.]" *Seibert*, 542 U.S. at 612, 124 S.Ct. 2601. The Court continued, "[U]nless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.*

The Magistrate Judge's analysis of the application of the five *Seibert*-plurality factors to this case is thoughtful, complete and persuasive.[8] To the extent Respon-

---

**6.** Respondent's other contentions, that Bucio's intellectual abilities did not interfere with the voluntariness of his confession, that Bucio was put at ease by the detective and that there was no psychological coercion, are conclusory statements, not factual circumstances surrounding the interrogation.

**7.** Under *Elstad*, if the first statement is found involuntary, the court should then examine whether the taint was removed through the passage of time between the statement and the *Miranda* warnings or through a change in circumstances. *See, e.g., Pacheco–Lopez*, 531 F.3d at 429. Respondent does not object to

this component of the Magistrate Judge's *Elstad* analysis, and the Court therefore need not address it here.

**8.** These factors are: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601. Respondent appears to have either dismissed the plurality's approach or conflated it with Jus-

dent addresses these factors, she fails to make the case that the late-administered *Miranda* warnings served to reasonably convey that Bucio had a "real choice about giving an admissible statement" at that point, that he could actually "choose to stop talking even [though] he had talked earlier." Respondent's strongest argument is that, because the detective reviewed each *Miranda* right individually when he did finally administer the warnings, "carefully defin[ing] the words and terms, ensuring Bucio's understanding," a reasonable person would have understood the warnings to signal a break from the earlier questioning and that he had a genuine choice whether to continue talking (doc. 27). However, that alone is simply insufficient. As the *Seibert* plurality noted, "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Seibert*, 542 U.S. at 613, 124 S.Ct. 2601. Instead, the Court continued,

> A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defen-

dant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 613–14, 124 S.Ct. 2601, quoting *Moran v. Burbine*, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Respondent contends, in an attempt to factually distinguish *Seibert* from this case, that the detective here did not "confront[ ] Bucio with his first unwarned statement or push[ ] him into acknowledging it once the *Miranda* warnings were administered" (doc. 27). She argues that the "absence of any reference to the earlier confession negated any impression that the second interview was a 'mere continuation of the earlier questions and responses'" (*Id.*). However, as the Magistrate Judge noted, the detective here did not only reference the earlier interview but tied the pre-*Miranda* and post-*Miranda* statements together by saying, after the administration of the warnings, "We [are] going to go through the story again" (doc. 23). The Court construes this, as it must be construed, as an overt reference to Bucio's earlier statement and as a fact that links the two statements together in a continuum. *See Seibert*, 542 U.S. at 617, 124 S.Ct. 2601.

Under Supreme Court law, it is simply not enough that the warnings were given with definitions here: more was needed in order for Bucio to know that his earlier, unwarned statement could not be used against him, that he had a genuine choice to stop talking even though he had already made a statement.

As the Magistrate Judge found, applying Justice Kennedy's framework to this case yields the same result (doc. 23). Either the detective's question-first, warn-second

tice Kennedy's but, either way, because Respondent has not made specific objections relating to these factors, the Court will not

simply reiterate the Magistrate Judge's Report in its entirety here.

approach was a deliberate attempt to thwart *Miranda*, in which case curative measures were required and, as discussed above, not present. *See Seibert*, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). Or, the detective's approach was not deliberate, in which case *Elstad* applies, and, as the Magistrate Judge found, Bucio's statements fail under *Elstad*.

For the foregoing reasons, the Court is persuaded by the Magistrate Judge's analysis and rationale, agrees with his conclusion, and finds that the state court's ruling admitting Bucio's statements was an unreasonable application of clearly established federal law.[9] Therefore, having thoroughly reviewed the matter, the Court agrees with the Magistrate Judge's recommended remedy, GRANTS Bucio's writ of habeas corpus on Ground Two, and ORDERS that Bucio be released from custody if a new trial is not scheduled within ninety (90) days from the entry of this Order.

## B. Ground Four

Bucio objects to the Magistrate Judge's recommendation that a writ not issue with respect to Ground Four and takes issue with the conclusion of both the state court and the Magistrate Judge that the range of punishment facing a discretionary serious youthful offender is determined by the jury's verdict, contending that this conclusion "eviscerates" the distinction between mandatory and discretionary blended sentencing (doc. 26). Bucio contends that under the state court and the Magistrate Judge's interpretation, the range of punishment for both the mandatory and the discretionary serious youthful offenders is the same-and the maximum for each is some amount of adult time. This, Bucio argues, is incorrect; the correct interpretation would have a maximum range of

punishment for *mandatory* serious youthful offenders including some amount of adult time, and a maximum range of punishment for *discretionary* offenders ending at adulthood. Anything beyond that statutory maximum range of punishment for a discretionary offender, Bucio argues, requires jury fact-finding because *Apprendi* requires that ". . . any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

Bucio additionally argues that the blending sentencing scheme is a violation of the fundamental fairness requirement of the due process clause of the federal Constitution because juveniles in the Ohio system cannot fairly be expected to engage in meaningful rehabilitation and succeed such that the adult portion of their sentences are not imposed because the Ohio Department of Youth Services ("ODYS") has failed and continues to fail to provide the juveniles in its system with basic safety, education and health needs (doc. 26). The Court construes Bucio's argument to be that given the "unconstitutional conditions of confinement in [O]DYS," the Court should grant Bucio's writ on this Ground Four because, *ipso facto*, the state's sentence of confinement was fundamentally unfair and thus contrary to federal law (doc. 26).

### 1. *Apprendi*

The defendant in *Apprendi* pleaded guilty to state weapons charges, and a state judge conducted an evidentiary hearing wherein he found by a preponderance of the evidence that the defendant was motivated by racial bias; consequently, the judge applied New Jersey's hate crimes

---

**9.** Respondent does not object to the Magistrate Judge's conclusion that the admission of

Bucio's statements was not harmless error, and the Court agrees with his conclusion.

statute to increase the defendant's sentence above the maximum that could otherwise have been imposed. *Apprendi*, 530 U.S. at 474–97, 120 S.Ct. 2348. The Supreme Court found that the hate-crimes enhancement imposed by the judge was a violation of the defendant's due process rights because, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. The relevant question is "one not of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. 2348. Put another way, "is the sentence allowed simply as a result of a conviction or plea or must the judge find additional facts first?" *State v. Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470, 489 (2006) (finding unconstitutional components of Ohio's adult sentencing scheme because judges were required to make specific findings before sentencing beyond that presumed by jury verdict).

In *Blakely*, the statutory maximum for the type of felony at issue was ten years; however, if no facts beyond those supporting the jury verdict were found by the judge, the statute provided that a defendant could not be sentenced above a "standard range" of forty-nine to fifty-three months. *Blakely*, 542 U.S. at 298–300, 124 S.Ct. 2531. The Court found that, because the sentencing judge could not have imposed a sentence outside that "standard range" without finding an additional fact, the standard range, not the ten years, was the actual "statutory maximum" for *Apprendi* purposes. *Id.* at 304, 124 S.Ct. 2531.

Bucio contends that the findings the judge must make to sentence a juvenile who falls in the discretionary category to adult time are analogous to the impermissible findings in *Blakely* and *Apprendi:* without those judge-made findings, the maximum Bucio could have received was a juvenile disposition until the age of twenty-one. Thus, Bucio reads Ohio's serious youthful offender statute to provide a "statutory maximum" for *Apprendi* purposes of twenty-one years for juveniles in the discretionary category.

Under Ohio law, a sentence involving a stayed adult portion is permissible for a discretionary offender *only* upon the judge's finding that the length of time, level of security and types of programming available in the juvenile system are not adequate for the juvenile court to reasonably expect that the purposes of juvenile sentencing will be met in light of the nature and circumstances of the violation and the history of the child. O.R.C. § 2152.13(D)(2)(a)(i); O.R.C. § 2152.01(A) (purposes of sentencing are "to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender."). If the judge does not make such a finding, a discretionary offender cannot be given an adult sentence.

Therefore, it appears as though an adult portion of a blended sentence for a discretionary juvenile offender is not available based simply on a conviction or plea; instead, judicial fact-finding is required. Critically, however, neither *Apprendi* nor *Blakely* involved judicial findings that subjected a juvenile to the potential of an adult sentence. Indeed, there is no Supreme Court authority on point. On a habeas petition, the only questions before the Court are whether the state court's decision involved an unreasonable application of clearly established Supreme Court law or whether the decision was contrary

to such law. Therefore, the question here is whether the *Apprendi* language regarding "fact[s] that increase[ ] the penalty for a crime beyond the prescribed statutory maximum," 530 U.S. at 490, 120 S.Ct. 2348, clearly applies to the findings required of the Ohio juvenile judge.

On similar questions, reasonable minds have reached differing results. *Compare Commonwealth v. Quincy Q.*, 434 Mass. 859, 753 N.E.2d 781, 789 (2001) (overruled on other grounds) (statute requiring judicial fact-finding in order to increase juvenile punishment unconstitutional) and *New Mexico v. Rudy B.*, 147 N.M. 45, 216 P.3d 810, 824 (N.M.App.2009) (holding New Mexico's juvenile sentencing scheme unconstitutional as violative of *Apprendi* because it required that the judge, not the jury, determine whether a juvenile would be amenable to rehabilitation with solely a juvenile sentence) *with State v. Kalmakoff*, 122 P.3d 224, 227 (Alaska Ct.App.2005) (declining to find statute unconstitutional where judge found facts that permitted juvenile to be tried as adult and stating that the "overwhelming weight of authority at this time concludes that *Apprendi* does not apply to juvenile waiver proceedings") and *State v. D.H.*, 120 Ohio St.3d 540, 901 N.E.2d 209 (2009) (finding Ohio's blended sentencing statute constitutional).

The crucial point is that neither *Apprendi* nor *Blakely* speaks to the types of facts being found by the Ohio juvenile judges and the *Apprendi's* fact-finding language therefore does not clearly apply to the type of facts found by the Ohio juvenile judges here. Therefore, the Court cannot say that the state court's decision was contrary to these decisions nor that it was an unreasonable application thereof. Whether the Court might have reached a different result or whether the state court's decision was incorrect are not relevant on a habeas petition. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146

L.Ed.2d 389 (2000); *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

### 2. Due Process

On a due process review, the Court reaches the same result. Bucio explicitly makes an argument that his sentence violates due process because of the dysfunction of the ODYS. In addition, however, clearly established federal law holds that it is the Fourteenth Amendment's due process clause that governs juvenile proceedings, not solely the Sixth Amendment, so even absent that argument, a due process inquiry would be called for. *See In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971); *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). Unlike the Sixth Amendment, which makes specific, discrete guarantees, the due process clause requires "fundamental fairness," a concept that is much more fluid. *Id.* Therefore, under a due process inquiry, the ultimate question for this Court is whether the state court's decision upholding Ohio's blended sentence scheme was contrary to or an unreasonable application of clearly established law regarding fundamental fairness in the juvenile context.

The Supreme Court has held that many of the basic constitutional protections afforded criminal defendants via the Sixth Amendment also apply to juveniles via the due process clause. *See, e.g., Gault*, 387 U.S. 1, 87 S.Ct. 1428 (notice of charges, right to counsel, right to confrontation and cross-examination). However, *McKeiver's* plurality expressly held that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." *McKeiver*, 403 U.S. at 545, 91 S.Ct. 1976. The *McKeiver* plurality held that "fundamental fairness" demanded only accurate fact-finding, which could be done in the

juvenile context either by a judge or a jury. *Id.* at 543, 91 S.Ct. 1976. The plurality did not present rationale and analysis for the lower courts but instead set forth a number of reasons, or justifications, for its decision. *Id.* at 545–50, 91 S.Ct. 1976.

Among the plurality's reasons were fears that jury trials would disrupt the traditional juvenile court and adversely affect the "intimate, informal and protective proceeding[s]" and that jury trials would make the juvenile system procedurally indistinguishable from the adult system. *Id.* at 545–46, 91 S.Ct. 1976. Irrespective of whether these fears were valid at the time, the equation is clearly quite different when the state has chosen by statute to extend to juveniles the option of a jury trial. In Ohio, the serious youthful offender statute guarantees nearly all of the rights constitutionally guaranteed to adult criminal defendants, including the rights to a grand jury determination of probable cause, to an open and speedy trial by jury, to bail, to counsel and to raise the issue of competency. O.R.C. § 2152.13(C)(1), (2). Ohio, then, has by statute created juvenile proceedings that mimic adult criminal proceedings in nearly all ways, and the Court questions *McKeiver's* relevance in such a situation.

However, this Court's thorough review of the relevant law has shown that there is a lack of clearly established Supreme Court law on the issue of juvenile dispositions in general, the effect of statutorily granting certain constitutional rights to juveniles but not others, and on the fundamental fairness of judges finding certain facts before sentencing juveniles to adult time. Consequently, the Court simply cannot find that the state court's decision was an unreasonable application of federal law.

Regarding Bucio's argument concerning the dysfunction of the ODYS, the Court finds Bucio's description of the condition of the DYS disturbing but is encouraged by the steps the ODYS has taken to rectify the situation. Regardless, the question before the Court is not whether the ODYS is adequately serving the needs of the public and the juveniles in its care. It is, again, whether the state court unreasonably applied clearly established federal law, or acted contrary to that law, or based its decision on an unreasonable determination of the facts in light of the evidence presented in the state proceedings. While his policy arguments may raise important questions, Bucio simply fails to address this fundamental question. The Court is unwilling to take such a sweeping position in the instant case on the strength of this argument. Bucio has simply not persuasively argued that sentencing Bucio to a blended sentence given the conditions of ODYS somehow constitutes an unreasonable application of federal law.

### 3. Conclusion on Ground Four

For the foregoing reasons, the Court finds that a writ should not issue with respect to Ground Four. However, Bucio's constitutional challenge to Ohio's blended sentencing scheme is colorable. Therefore, because reasonable jurists may find the Court's assessment of Bucio's constitutional claims "debatable or wrong," *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), issuance of a certificate of appealability of this order pursuant to 28 U.S.C. § 2253(c) is GRANTED.

### C. Ground Six

Neither Respondent nor Bucio objects to the Magistrate's Report and Recommendation with respect to Ground Six. Having thoroughly reviewed the matter, the Court is persuaded by the Magistrate Judge's analysis and rationale and ADOPTS his recommendation with respect to Ground Six. Therefore, the Court OR-

DERS that the plea bargain that had been previously offered to Bucio by the government, which was not conveyed to Bucio by his trial counsel, be reinstated in its entirety and that, should Bucio accept the bargain, Bucio be sentenced according to the terms of the agreement.[10]

## VI. Conclusion

The Court finds that the Magistrate Judge's Report and Recommendation is thorough and well-reasoned. For the foregoing reasons, the Court ADOPTS and AFFIRMS the Magistrate Judge's Report and Recommendation with respect to Ground Two, GRANTS Bucio's writ of habeas corpus on Ground Two, and ORDERS that Bucio be released from custody if a new trial is not scheduled within ninety (90) days from the filing of this Order; ADOPTS and AFFIRMS the Magistrate Judge's Report and Recommendation with respect to Ground Six, GRANTS Bucio's writ of habeas corpus on Ground Six, and ORDERS that the plea bargain that had been previously offered to Bucio by the government be reinstated in its entirety and that, should Bucio accept the bargain, he be sentenced according to the terms of the agreement; and ADOPTS and AFFIRMS the Magistrate Judge's Report and Recommendation with respect to Ground Four, DENIES Bucio's writ of habeas corpus on Ground Four, and ORDERS that a certificate of appealability shall issue in respect thereof.

SO ORDERED.

10. With respect to Bucio's claim that he was denied effective assistance of counsel because his trial counsel failed to adequately investigate and procure expert evidence on his brother's cause of death, the Magistrate Judge recommended that the Court hold an evidentiary hearing on the issue because Bucio was not given a full and fair evidentiary hearing at the state level. The Court agrees with the Magistrate Judge's analysis on this point and adopts his recommendation. However, because the Court grants Bucio's writ on other

## REPORT AND RECOMMENDATION

TIMOTHY S. BLACK, United States Magistrate Judge.

Petitioner, a state prisoner, brings this case through counsel seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition (Doc. 1), respondent's return of writ and exhibits thereto (Doc. 10), and petitioner's traverse to the return of writ. (Doc. 19).

## I. FACTS

This case involves the following facts, as summarized by the Twelfth District Ohio Court of Appeals: [1]

In June 2003, appellant's mother left her apartment, leaving appellant in charge of his four younger siblings. Appellant was 13 years old at the time. His siblings were ages ten years, three years, two years, and 13 months. While their mother was gone, appellant and his siblings were to clean two bedrooms, prepare dinner, and bathe. At some point after dinner, appellant called his ten-year-old brother, A.B., and told him that something was wrong with their 13–month–old brother, J.R. When it was apparent that J.R. was not breathing, appellant performed mouth-to-mouth resuscitation. A.B. subsequently administered chest compressions. J.R. was not

grounds, the need for an evidentiary hearing is obviated at this time. If, however, a new trial is held, Bucio may certainly pursue an expert at that time.

1. The factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *see McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir.2004).

responsive. Appellant and A.B. looked for the phone, but could not find it. Appellant then brought J.R. to the couch in a blanket, where the children prayed as they waited for their mother to return.

The children's mother eventually arrived home with her boyfriend. At that time, J.B. told his mother that J.R. had fallen down the stairs. After examining J.R., appellant's mother called 9–1–1. Emergency personnel soon arrived, and transported J.R. to the hospital via ambulance. Appellant's mother rode in the ambulance to the hospital, while the police transported appellant and his other siblings to the police station. J.R. subsequently died at the hospital.

Detective Hayes of the Hamilton Police Department spoke with the children at the police station. Because appellant was the oldest child, Detective Hayes interviewed him first. According to Detective Hayes, appellant was not suspected of a crime at that time. Appellant initially told Detective Hayes that J.R. had fallen down the stairs. Detective Hayes questioned the veracity of that statement, and informed appellant that J.R. had died. Appellant then cried and said that he was sorry. Appellant told Detective Hayes that he struck J.R. with a metal bar, and choked J.R. around the neck. After appellant made those statements, Detective Hayes read appellant his *Miranda* rights. Appellant subsequently waived his *Miranda* rights and signed a statement consistent with his oral statements.

(Doc. 10, Exh. 31 at 2–3).

## II. PROCEDURAL HISTORY [2]

On June 17, 2003, two complaints were filed in the Butler County, Ohio Juvenile Court, one alleging that Bucio was a delinquent child for committing the murder of his 13 month old brother and the other alleging delinquency for his committing domestic violence against his brother. (Doc. 10, Exhs. 1 and 2). Detective Mark Hayes was named as the complainant and issuing officer. (*Id.*). On June 18, 2003, Bucio entered a plea of "not true" to both allegations. (Doc. 10, Exh. 3). The juvenile court appointed a private attorney and a guardian ad litem to represent Bucio. (Doc. 10, Exh. 3; Exh. 31 at 3)

On July 16, 2003, the Butler County Grand Jury indicted Bucio on one count of felony murder as defined in Ohio Revised Code Section 2903.02(B) and one count of endangering children as defined in Ohio Revised Code Section 2919.22(B)(1). The grand jury found Bucio age-eligible for disposition as a "serious youthful offender" pursuant to Ohio Revised Code Sections 2152.13(C)(1) and 2152.11. (Doc. 10, Exh. 4). The case was transferred to the Butler County Juvenile Court Division under the provisions of the Serious Youthful Offender Statute, Section 2152.03 (Doc. 10, Exh. 5). On July 21, 2003, Bucio pled "not true" to the indictment. (Doc. 10, Exh. 31 at 3; Exh. 24 at 1).

On July 21, 2003, Bucio also filed a motion to dismiss the indictment. (Doc. 10, Exh. 70). Bucio argued the State had not complied with procedures for initiating a serious youthful offender prosecution, and thereby violated his due process rights. (*Id.*; Doc. 10, Pretrial Hearing, August 11, 2003, Tr. 5–9).[3] The juvenile court denied Bucio's motion to dismiss the indictment. (Doc. 10, Pretrial Hearing, August 11, 2003, Tr. 9; Exh. 6).

---

**2.** Petitioner adopts the procedural history set forth in respondent's return of writ. (Doc. 19 at 2). Therefore, the Court adopts the same.

**3.** All transcripts are filed as Exhibit 71 to Doc. 10.

Upon defense counsel's suggestion that his client was incompetent filed on September 22, 2003, the Court ordered that Bucio undergo a competency evaluation.[4] (Doc. 10, Pretrial Hearing, Sept. 22, 2003, Tr. 4–5). Dr. Bobbie Hopes and Dr. Charles Lee, both psychologists, evaluated petitioner, each reaching different conclusions regarding Bucio's competency. (Doc. 10, Exh. 9, Competency Reports). On November 23, 2003, Bucio moved for a third evaluation. (Doc. 10, Exh. 9). On December 4, 2003, the Court conducted a competency hearing, in which the court and counsel extensively questioned Drs. Hopes and Lee concerning the tests they conducted, the information gathered from others associated with Bucio, and their clinical impressions and conclusions. (Doc. 10, Competency Hearing, Dec. 4, 2003). At the conclusion of the testimony, the Court denied Bucio's request for a third evaluation. (*Id.* at Tr. 59–60; Doc. 10, Exh. 10). After listening to the expert testimony and counsels' argument, the court found Bucio competent to stand trial. (*Id.* at Tr. 64–66; Doc. 10, Exh. 10).

On February 18, 2004 and May 4, 2004, Bucio filed motions to suppress statements he made to Detective Hayes. (Doc. 10, Exh. 11). After an evidentiary hearing on June 10, 2004, the juvenile court denied the motion to suppress. (Doc. 10, Exh. 12; Suppression Hearing, June 10, 2004).

On June 21, 2004, Jorge's jury trial began. The State called police officer Chris Fackey, Detective Mark Hayes, Armando (Jorge's brother) and Coroner Richard Burkhardt. (Jury Trial, June 21–23, 2004). On June 23, 2004, the jury returned a verdict of guilty to both child endangering and murder. (Doc. 10, Exhs. 13 and 14).

On July 1, 2004, Bucio, through counsel, filed a motion for a new trial and motion for arrest of judgment in the Butler County Juvenile Court. (Doc. 10, Exh. 16). The State urged the court to deny the motion. (Doc. 10, Exh. 17). On August 4, 2004, the juvenile court denied Bucio's motion for a new trial. (Doc. 10, Exh. 18, Case No. JV2003–1856).

At the August 13, 2004 dispositional hearing, the defense presented the testimony of Jorge's therapist and the former deputy supervisor of the juvenile detention facility, and the court also heard from Jorge and his mother. (Dispositional Hearing, Aug. 13, 2004). After considering the Pre-sentence Investigation Report, the rehabilitation assessment and counsel's arguments, the juvenile court ordered a "blended" sentence. First, the court committed Bucio to the Department of Youth Services until he reached the age of 21. Second, the court ordered an adult sentence under the serious youthful offender statute of concurrent terms of fifteen years to life for murder and two years for child endangering. The court stayed the serious youthful offender portion of Bucio's sentence, pending the successful completion of his juvenile sentence. (Doc. 10, Exh. 15, Case No. JV2003–1856).

On August 25, 2004, Bucio, through counsel filed a second motion for new trial in the Butler County Juvenile Court, alleging that he had discovered new evidence, apparently of impeachment value. (Doc. 10, Exh. 19). After reviewing the State's response (Doc. 10, Exh. 20), the Juvenile Court denied Bucio's motion on September 16, 2004. (Doc. 10, Exh. 21, Case No. JV2003–1856).

---

**4.** On October 8, 2003, Bucio's guardian ad litem filed a motion to provide confidential therapy for Bucio (Doc. 10, Exh. 7), which the court granted. (Doc. 10, Exh. 8). *See* Pretrial Hearing, Oct. 17, 2003.

**Direct Appeal**

On September 9, 2004, Bucio, through trial counsel, filed a timely notice of appeal in the Twelfth District Court of Appeals, Butler County, Ohio. (Doc. 10, Exh. 22). After taking over Bucio's representation, the Ohio Public Defender raised the following assignments of error:

1. The juvenile court violated R.C. 2152.13, and Jorge Bucio's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution when it overruled the defense motion to dismiss the indictment. (A–16); (August 11, 2003, Transcript).

2. Jorge Bucio was denied his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16 of the Ohio Constitution in that he was found guilty of child endangering and murder when he was incompetent to stand trial. (Transcript of Competency Proceedings).

3. The juvenile court erred when it denied Jorge Bucio's motion to suppress the statements he made during a custodial interrogation because those statements were elicited in violation of his constitutional right against self-incrimination. (Transcript of suppression hearing).

4. The trial court violated Jorge Bucio's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 16 of the Ohio Constitution, and Juv. R. 29(E)(4) when it adjudicated him delinquent of child endangering and murder absent proof of every element of the charge against him by sufficient, competent and credible evidence.

5. The trial court violated Jorge Bucio's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution when it adjudicated him delinquent of child endangering and murder, when that finding was against the manifest weight of the evidence.

6. The cumulative effect of errors resulted in the denial of Jorge Bucio's right to a fair trial guaranteed by the Fourteenth Amendment to the United States Constitution.

7. Jorge Bucio was denied his constitutional right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. (Transcript of Proceedings).

8. The juvenile court abused its discretion when it committed Jorge Bucio to the Ohio Department of Youth Services until his twenty-first birthday and further abused its discretion when it found that there was a necessity for a serious youthful offender dispositional sentence. (Disposition Transcript).

9. The trial court erred when it imposed a term of incarceration that exceeded the minimum term of incarceration. The serious youthful offender sentence was improperly based on facts that were not found by the jury, in contravention of *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, 2004 WL 1402697. (August 13, 2004, Transcript)

10. Ohio serious youthful offender dispositional sentencing scheme, R.C. 2152.021, R.C. 2152.11, and R.C. 2152.13, violates a juvenile's right against cruel and unusual punishment and violated Jorge Bucio's right against cruel and unusual punishment as applied as guaranteed by the Eighth and Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution. (A–40); (August 13, 2004, Transcript).

11. Ohio's serious youthful offender law, R.C. 2152.021, R.C. 2152.11, R.C. 2152.13, and R.C. 2152.14 violates a juvenile's right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. (Transcript of Proceedings).

(Doc. 10, Exh. 23). The State filed a responsive brief (Doc. 10, Exh. 24), to which Bucio replied. (Doc. 10, Exh. 25). Both parties supplemented their briefs with additional authorities. (Doc. 10, Exhs. 26, 27, 28). The State objected to Bucio's inclusion of parts of the legislative history of the serious youthful offender statute into the record. (Doc. 10, Exh. 29). Nevertheless, on August 22, 2005, with the appellate court's permission, Bucio filed a supplemental brief which re-addressed his first assignment of error in light of the legislative history of the serious youth offender statute. (Doc. 10, Exh. 30). On December 30, 2005, the Twelfth District Court of Appeals overruled each of Bucio's eleven assignments of error and affirmed the judgment of the juvenile court. (Doc. 10, Exh. 31, Case No. CA2004–09–226).

On February 13, 2006, Bucio, through counsel, filed a timely notice of appeal in the Supreme Court of Ohio. (Doc. 10, Exh. 32). In his memorandum in support of jurisdiction, Bucio raised the following propositions of law:

1. There is no "protective custody" exception to *Miranda v. Arizona* (1966), 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694], and if a juvenile is interrogated without warning while held in police custody and not free to leave, any statements resulting from the interrogation must be suppressed.

2. Statements obtained from juveniles under fourteen during custodial interrogation are presumptively involuntary.

3. An adjudication of delinquency for homicide by felony-murder is not supported by sufficient evidence when the predicate offense for the felony-murder is child endangering and the same conduct forms the basis of both the child endangering and the homicide.

4. R.C. 2152.13(A) requires the State, until an indictment or bill of information is obtained, to file a written notice of intent to seek a "serious youthful offender" dispositional sentence and to serve such notice on the alleged delinquent.

5. The R.C. 2945.37(G) standard for assessing an adult's competency to stand trial governs competency determinations in "serious youthful offender" proceedings.

6. Due process requires requests for competency evaluations be reviewed with a more exacting standard of review.

7. The cumulative effect of errors deprives a defendant of the constitutional right to a fair trial. *State v. DiMarco* [*DeMarco*] (1987), 31 Ohio St.3d 191, 196–197 [509 N.E.2d 1256].

8. A defendant is denied his constitutional right to effective assistance of trial counsel when counsel's performance is deficient and that deficient performance prejudices the defense.

9. A sentencing court abuses its discretion when it denies an indigent juvenile funds for a sentencing report and disregards all of the evidence and testimony in order to make the requisite findings in order to impose a serious youthful offender dispositional sentence.

10. A trial court that imposes a sentence by using factors which are not found by a jury or admitted by the defendant violates the defendant's rights to due process.

11. Ohio's serious youthful offender dispositional sentencing scheme violates a juvenile's right against cruel and un-

usual punishment and violated Jorge Bucio's right against cruel and unusual punishment.

12. Ohio's serious youthful offender law violates a juvenile's right to due process.

(Doc. 10, Exh. 33).

On February 13, 2006, the "Justice for Children Project" filed an amicus brief in support of Bucio. (Doc. 10, Exh. 34). The State filed a memorandum in opposition to jurisdiction. (Doc. 10, Exh. 35). On May 24, 2006, the Ohio Supreme denied Bucio leave to appeal and dismissed the appeal as not involving any substantial constitutional question. (Doc. 10, Exh. 36). Bucio and the Justice for Children Project each filed motions for reconsideration. (Doc. 10, Exh. 37 and 38). The State opposed Bucio's motion. (Doc. 10, Exh. 39). On August 2, 2006, the Supreme Court of Ohio denied reconsideration. (Doc. 10, Exh. 40, Case No. 2006–0339).

On October 31, 2006, Bucio filed a petition for writ of certiorari in the Supreme Court of the United States. (Doc. 10, Exh. 41). On February 26, 2007, the United States Supreme Court denied the petition. (Doc. 10, Exh. 42, Case No. 06–7611).

### Post–Conviction Proceedings

On May 3, 2005, while his direct appeal was pending in the Ohio Court of Appeals, Bucio, through counsel, filed a post conviction petition in the Butler County Juvenile Court, raising the following grounds for relief:

1. Defense counsel provided ineffective assistance of counsel when he failed to present to Jorge a proposed plea agreement by the State. Thus, Jorge's convictions and sentences are void or voidable because he was denied his rights as guaranteed by Sections 10 and 16, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

2. The trial court denied Jorge Bucio his rights to due process of law, equal protection, a fair trial, and to present a defense when the court denied his motion for a third competency evaluation. Thus, Jorge's convictions are void or voidable because he was denied his rights as guaranteed by Sections 10 and 16, Article I, of the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

3. The trial court's ruling denying Jorge's motion for a third competency evaluation denied Jorge his right to effective assistance of counsel. Thus, Jorge's convictions are void or voidable because he was denied his rights as guaranteed by Sections 2, 5, 6, 10, 16 and 20, Article I, of the Ohio Constitution and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

4. Defense counsel provided ineffective assistance of counsel for failing to adequately examine Dr. Hopes and Detective Hayes regarding Jorge Bucio's competency to waive his *Miranda* rights at Jorge's Suppression Hearing. Thus, Jorge's convictions and sentences are void or voidable because he was denied his rights as guaranteed by sections 10 and 16, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

5. Defense counsel provided ineffective assistance of counsel in failing to consult with and seek the testimony of an expert witness to rebut the testimony of the State's expert witness, Dr. Richard Burkhardt, the Butler County Coroner. Thus, Jorge's convictions and sentences are void or voidable because he was denied his rights as guaranteed by Sections 10 and 16, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

6. Defense counsel provided ineffective assistance of counsel in failing to consult with and seek the testimony of an expert witness regarding the culpability of Jorge Bucio, a thirteen year old child, to commit child endangering and murder. Thus, Jorge's convictions and sentences are void or voidable because he was denied his rights as guaranteed by Sections 10 and 16, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments of the United States Constitution.

7. The trial court denied Jorge Bucio his rights to due process of law, equal protection, and a fair trial when the court denied his motion for appointment of an expert to evaluate Jorge's amenability. Thus, Jorge's sentences are void or voidable because he was denied his rights as guaranteed by Sections 10 and 16, Article I, of the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

8. The trial court's ruling denying Jorge's motion for appointment of an expert to evaluate Jorge's amenability denied Jorge his right to effective assistance of counsel. Thus, Jorge's sentences are void or voidable because he was denied his rights as guaranteed by Sections 2, 5, 6, 10, 16 and 20, Article I, of the Ohio Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Doc. 10, Exh. 43). In support of the petition, Bucio submitted his own affidavit, affidavits of his guardian ad litem and defense counsel, and affidavits from two experts, Jolie S. Brams, a clinical psychologist, and Dr. Werner U. Spitz. (*Id.*). The State filed an answer to Bucio's post-conviction petition and a motion for pre-hearing review and dismissal without hearing. (Doc. 10, Exh. 44). On May 25, 2005, the juvenile court denied Bucio's petition without an evidentiary hearing, finding the claims barred by the doctrine of *res judicata* and that Bucio's grounds "do not create sufficient facts to demonstrate constitutional error." (Doc. 10, Exh. 45, Case No. JV2003–1856).

On June 13, 2005, Bucio filed a motion for relief from judgment in the juvenile court on the basis that the juvenile court had ruled on the petition before Bucio had an opportunity to reply to the State's answer and related motions. (Doc. 10, Exh. 47). The State filed a motion in opposition (Doc. 10, Exh. 48), to which Bucio responded. (Doc 10, Exh. 49). On July 7, 2005, the juvenile court denied Bucio's motion for relief from judgment. (Doc. 10, Exh. 50).

Bucio filed timely notices of appeal from the judgment entries denying his post-conviction petition and his motion for relief from judgment. (Doc. 10, Exhs. 46, 51). The Ohio Court of Appeals consolidated these cases for purposes of appeal.[5] (Doc. 10, Exh. 54). In his merit brief, Bucio raised the following assignments of error:

1. The trial court erred in applying the doctrine of res judicata to Jorge Bucio's

---

5. Bucio, through counsel, filed a timely notice of appeal from the judgment entry denying his motion for relief from judgment under case number CA2005–377. (Doc. 10, Exh. 51). He had also filed, on June 29, 2005, a notice of appeal from the judgment denying his post-conviction petition, which was assigned case number CA2005–06–176. (Doc. 10, Exh. 46). In addition, on July, 20, 2005, a *second* notice of appeal was inadvertently filed, under case number CA2005–193, regarding the juvenile court's May 25, 2005, denial of his post-conviction petition. (Doc. 10, Exh. 52; see Exh. 53 at 2). Bucio then filed a motion to consolidate the appeals. (Doc. 10, Exh. 53). The Court of Appeals ordered case numbers CA2005–176, CA2005–193 and CA2005–377 consolidated, with all future filings to be made under case number CA2005–176. (Doc. 10, Exh. 54).

claims for relief, thus violating Jorge's constitutional rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, and Sections 5 and 16, Article I of the Ohio Constitution. 2. The trial court erred in dismissing Jorge Bucio's petition without an evidentiary hearing because Jorge provided sufficient evidence that he was denied the effective assistance of counsel, due process, equal protection and a fair trial. 3. The trial court erred in denying Jorge Bucio's petition for State post-conviction relief because Jorge established that he was deprived of his rights to the effective assistance of counsel, due process, equal protection, and a fair trial, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 2, 10 and 16 and Article I and Section 39, Article II of the Ohio Constitution. 4. The trial court erred when it denied Jorge Bucio's motion for relief from judgment.

(Doc. 10, Exh. 55).

The State filed a responsive brief (Doc. 10, Exh. 56), to which Bucio replied. (Doc. 10, Exh. 57). On May 30, 2006, the Court of Appeals overruled each of Bucio's assignments of error and affirmed the judgment of the trial court. (Doc. 10, Exh. 58, Case Nos. CA2005–176, CA2005–193 and CA2005–377). The Court determined that some of the claims raised in Bucio's post-conviction petition were barred from review by the doctrine of res judicata, and, with respect to his other claims, that Bucio had failed "to set forth sufficient operative facts establishing a claim of ineffective assistance of counsel." (*Id.*).

On July 14, 2006, Bucio, through counsel, filed a timely notice of appeal to the Supreme Court of Ohio. (Doc. 10, Exh. 59). In his memorandum in support of jurisdiction, Bucio raised the following propositions of law:

1. Applying the doctrine of res judicata to bar a petitioner's grounds for relief in a post-conviction petition when those claims could not have been raised at trial or on appeal and when those claims are based on affidavits and other evidence dehors the record deprives a petitioner of their constitutional rights. U.S. Constitution Amendment V, VI, XIV; § 2, 5, 10, 16, Article I, § 39, Art. II, OH. Constitution.

2. The trial court's refusal to conduct an evidentiary hearing in a post-conviction case, when the petition and supporting documentary evidence demonstrate substantive grounds for relief, deprives a petitioner of their constitutional rights. U.S. Constitution Amendment V, VI, XIV; § 2, 5, 10, 16, Article I, § 39, Art. II, OH. Constitution.

3. Denying a petition for post-conviction relief when the petitioner established he was deprived of his constitutional rights to the effective assistance of counsel, due process, equal protection, and a fair trial, deprives a petitioner of their constitutional rights.

4. Denying a petitioner's motion for relief from judgment deprives a petitioner of their constitutional rights. U.S. Constitutional Amendment V, VI, XIV; § 2, 5, 10, 16, Article I, § 39, Art. II, OH. Constitution.

(Doc. 10, Exh. 60). The State filed a memorandum in response. (Doc. 10, Exh. 61).

On October 4, 2006, the Supreme Court of Ohio denied Bucio leave to appeal and dismissed the appeal as not involving any substantial constitutional question. (Doc. 10, Exh. 62, Case No.2006–1345).[6]

---

**6.** After exhausting his state court remedies of a direct appeal and post-conviction relief, Bu-

## Federal Habeas Corpus

Petitioner filed the instant petition for a writ of habeas corpus setting forth the following grounds for relief:

**GROUND ONE:** Petitioner was denied due process of law when he was found guilty of child endangering and murder when he was incompetent to stand trial, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

**Supporting Facts:** Petitioner was thirteen years old at the time he was tried for child endangering and murder. Because he was charged as a serious youthful offender, Petitioner received a trial by jury, and faced a potential 8 years in a juvenile prison and seventeen years to life in an adult prison once convicted. Two competency evaluations were performed, and a third was requested, but denied by the trial court. One evaluation found Petitioner not competent to stand trial; the other found him competent, however, that evaluation clarified that information should be presented to Petitioner in terms he can understand. Petitioner's competency was assessed according to the "juvenile norms" standard, as opposed to the standard applicable for adults facing criminal punishment.

**GROUND TWO:** Petitioner was denied his right against self-incrimination.

**Supporting Facts:** Petitioner was 13 years old, with limited intellectual abilities, and primarily spoke Spanish at the time of his interrogation. Petitioner was taken to the police station by a police officer sometime before 1:00 a.m. Because of his young age and the police station being in a high crime area, Petitioner was not permitted to leave the station. He was interviewed by a detec-

tive as a potential witness at 2:20 a.m. without the presence of his parent or any counsel. The detective did not believe Petitioner's version of events, so he continued to question him. The detective told Petitioner that his brother had died, and that he did not believe Petitioner was telling the truth. The detective testified that after Petitioner confessed, at around 3:00 a.m., Petitioner became a suspect. At that time, Petitioner was advised of his *Miranda* rights. Petitioner signed a waiver form, and proceeded to tell the same confession again. The detective typed a statement. The written statement is a combination of Petitioner's words and the detectives paraphrasing, per the detective's testimony. The statement was read to Petitioner because the detective was not certain Petitioner could read the statement. Petitioner signed the statement at around 4:00 a.m. The trial court denied Petitioner's Motion to Suppress.

**GROUND THREE:** Petitioner was denied due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, when he was charged and convicted under the felony-murder doctrine; and, because of a juvenile's reduced culpability, Petitioner was denied his right against cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

**Supporting facts:** The indictment alleged that Petitioner, at age thirteen years, caused the death of J.R. (age thirteen months) as a proximate result of committing or attempting to commit an offense of violence to wit: Endangering Children, that is a felony of the first or second degree and that is not a viola-

cio, filed a *pro se* request for judicial release on January 4, 2007 and then again on February 20, 2007. (Doc. 10, Exhs. 63, 65). His

efforts were unsuccessful. (Doc. 10, Exhs. 64, 66, Case No. JV2003–1856).

tion of section 2903.03 (voluntary manslaughter) or 2903.04 (involuntary manslaughter) of the Ohio Revised Code. In addition, it was alleged that Petitioner did recklessly abuse J.R., a child under eighteen years of age, which resulted in serious physical harm, which offense is a felony of the second degree, in violation of 2919.22(B)(1), Endangering Children. At no time was Petitioner ever alleged to have committed a purposeful killing. Petitioner, a thirteen year old boy, was left at home to care for his four younger siblings. After Petitioner lost his temper, because Petitioner was unable to console J.R., J.R. fell unconscious, and Petitioner and his ten year old brother improperly performed CPR on J.R. J.R. died from a hemorrhage in the pericardial sac, which holds the heart. Petitioner was sentenced to more than seven years in a juvenile prison, and received fifteen years to life in an adult prison, which sentence is suspended pending successful completion of the juvenile disposition.

**GROUND FOUR:** Petitioner was denied due process of law and trial by jury because the trial court made certain mandatory statutory findings before imposing a sentence greater than the maximum term authorized by the jury verdict, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

**Supporting facts:** The juvenile court made certain mandatory statutory findings before imposing an adult criminal sentence on Petitioner. Petitioner was sentenced to the maximum juvenile disposition and, based on the findings made by the trial court, Petitioner received an additional adult criminal sentence of fifteen years to life for murder, and two years for child endangering, to run concurrently. The adult criminal sentence is suspended pending successful completion of the juvenile disposition.

**GROUND FIVE:** Petitioner was denied due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, because the State failed to abide by notice requirements in pursuing a Serious Youthful Offender Proceeding.

**Supporting facts:** This case was initiated by the filing of two complaints, that alleged Petitioner committed the offenses of murder and domestic violence. The complaints did not request a serious youthful offender proceeding. Petitioner was arraigned on the charges. Twenty-nine days after arraignment, the Grand Jury returned an indictment alleging Petitioner committed the offenses of child endangering and murder, and determined that Petitioner was age-eligible for a serious youthful offender disposition. The State failed to abide by the notice requirements which require the State, until the indictment or bill of information is obtained, to request a serious youthful offender disposition in the original complaint or file a written notice of intent to seek a serious youthful offender sentence within twenty days after the initial hearing.

**GROUND SIX:** Petitioner was denied effective assistance of trial counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

**Supporting facts:** Trial counsel failed to present to Petitioner a proposed plea agreement by the State. The State offered a plea bargain but Petitioner was not presented with the proposed agreement until after his trial counsel turned it down. Petitioner informed his Guardian ad Litem that he was interested in the proposed agreement, but the guardian was unable to contact trial counsel. Upon contacting the prosecutors office, the guardian was informed the plea bargain was no longer available. Trial

counsel was also ineffective when he failed to object at certain stages of the proceedings, failed to request a competency evaluation using the adult standard, failed to make an adequate record during voir dire, failed to call any defense witnesses, failed to make sure the trial record was complete, failed to adequately examine witnesses regarding Petitioner's competency to waive his *Miranda* rights, failed to consult with and seek the testimony of an expert witness to rebut the testimony of the coroner, and failed to consult with and seek the testimony of an expert witness regarding the culpability of Petitioner.

(Doc. 1).

Subsequent to the filing of the habeas petition, petitioner voluntarily dismissed Grounds One, Three and Five of the petition. (Doc. 18). Therefore, Grounds Two, Four and Six are now before the Court for disposition.

## III. STANDARD OF REVIEW

■ On federal habeas review, the factual findings of the state appellate court are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). *See McAdoo v. Elo,* 365 F.3d 487, 493–94 (6th Cir.2004); *Mitzel v. Tate,* 267 F.3d 524, 530 (6th Cir.2001). This Court is bound by the state court adjudications unless those decisions are contrary to or an unreasonable application of clearly established federal law. *Franklin v. Francis,* 144 F.3d 429, 433 (6th Cir.1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits in state court unless the adjudication either:

1. resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrases "contrary to" and "unreasonable application" have independent meanings: A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in ... [Supreme Court] cases, or if it decides a case differently that we have done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable ... and an unreasonable application is different from an incorrect one.

*Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citation omitted).

■ However, if a state court does not articulate the reasoning behind its decision or fails to adjudicate the constitutional issues, the AEDPA deferential standard of review set forth in section 2254(d) is inapplicable. *See Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Towns v. Smith,* 395 F.3d 251, 257 (6th Cir.2005); *see also Clinkscale v. Carter,* 375 F.3d 430, 436 (6th Cir.2004) (citing *Maples v. Stegall,* 340 F.3d 433, 436 (6th Cir.2003) ("Where as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the defer-

ence due under AEDPA does not apply.")). Under these circumstances, the constitutional claim is reviewed de novo and the Court considers "the totality of the evidence-'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].'*" *Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527 (emphasis in the original) (quoting *Williams v. Taylor,* 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). *Accord Clinkscale,* 375 F.3d at 436.

## IV. WAS PETITIONER DENIED HIS RIGHT AGAINST SELF–INCRIMINATION AS ALLEGED IN GROUND TWO OF THE PETITION?

Petitioner's second ground for relief asserts that he was denied his right against self-incrimination in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Petitioner asserts he made his initial oral statement without the required *Miranda* warnings and that his second written statement was the product of his prior coerced confession and not voluntary under *Miranda.* Petitioner contends the Ohio Court of Appeals' decision on his Fifth Amendment claims was contrary to, or involved an unreasonable application of, the Supreme Court's decision in *Miranda* and its progeny defining the "custody" and "interrogation" requirements of *Miranda.* (Doc. 19 at 3).

Specifically, petitioner challenges the state court's determination that petitioner was not "in custody" for purposes of *Miranda* when he made his first statement to police. Next, he asserts that his oral statements were a product of police interrogation and obtained in violation of *Miranda.* Finally, petitioner contends the second written statement given to police was the product of his prior coerced confession and violated *Miranda.*

In overruling this assignment of error, the Ohio Court of Appeals stated:

{53} It is well-established that the duty to advise a suspect of constitutional rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602 [16 L.Ed.2d 694], arises only when questioning by law enforcement officers rises to the level of a custodial interrogation. *State v. Gumm,* 73 Ohio St.3d 413, 429, 1995 Ohio 24 [653 N.E.2d 253]. In *Miranda,* the court described custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444 [86 S.Ct. 1602]. In determining whether an individual is in custody, the ultimate inquiry is whether there was a formal arrest or a "restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517 [77 L.Ed.2d 1275].

{54} Where a suspect has not been formally arrested, "the restraint on the suspect's freedom of movement must be significant in order to constitute custody." *State v. Coleman,* Butler App. No. CA2001–10–241, 2002 Ohio 2068, ¶ 23 [2002 WL 745322]. Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. *State v. Fille,* Clermont App. No. CA2001–08–066, 2002 Ohio 3879, ¶ 18 [2002 WL 1310371]. However, a noncustodial situation is not converted into a custodial situation simply because questioning takes place in a police station. *Id.,* citing *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711 [50 L.Ed.2d 714]. Whether a person is in custody for *Miranda* purposes depends on the objective circumstances of

the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v. California* (1994), 511 U.S. 318, 323–324, 114 S.Ct. 1526 [128 L.Ed.2d 293].

{55} At the motion to suppress hearing, Detective Hayes described his interview of appellant. At about 1:00 a.m. on June 17, 2003, Detective Hayes was called to investigate the death of the victim that had occurred in the late evening of June 16, 2003. After going to the apartment where the death took place, Detective Hayes arrived at the Hamilton police station. Because appellant's mother accompanied the victim to the hospital, Hamilton police officers had transported appellant and his siblings to the police station for their safety. In order to determine what had occurred, Detective Hayes decided to interview appellant and his siblings. Because appellant was the oldest child, Detective Hayes interviewed him first. Detective Hayes testified that he did not consider appellant a suspect at that time. While appellant was being interviewed, his siblings sat in chairs by the front desk of the station.

{56} Detective Hayes conducted the interview at his desk in one of the investigation sections. Detective Hayes sat behind his desk while appellant sat in a chair on the other side of the desk. Five other desks were in the room, one for each of the other detectives in the section. None of those detectives were present at the time. Detective Hayes testified that he did not restrict appellant in any way. He offered appellant food, but appellant refused. Appellant never asked to use the restroom, nor did he ever ask for a break. Detective Hayes testified that he would have allowed appellant to use the restroom had he asked.

{57} Detective Hayes began the interview, which commenced at 2:20 a.m., with ten minutes of "rapport building." Appellant soon informed Detective Hayes that the victim had fallen down the stairs. Because Detective Hayes had been to the apartment where appellant lived and seen only five or six stairs at the most, he did not believe such a fall could have caused the victim's injuries. When Detective Hayes told appellant that he did not believe him, appellant reiterated his story. Being unsure that appellant knew of the victim's death, Detective Hayes told appellant that fact. At that point, appellant began crying, saying he was sorry for what he had done. When Detective Hayes asked appellant what he was sorry for, appellant began a narrative in which he confessed to harming the victim. Appellant told Detective Hayes that he struck the victim with a metal bar, and that he choked the victim "around the neck" when the victim would not stop crying. Detective Hayes testified that appellant finished his narrative by 3:00 a.m., approximately 40 minutes after the interview commenced.

{58} Once appellant confessed to harming the victim, Detective Hayes read appellant his *Miranda* rights. Appellant subsequently signed a document in which he waived his *Miranda* rights, and another document reiterating his oral confession. Appellant's contact with Detective Hayes ended by 4:00 a.m. At that time, Hamilton police officers transported appellant to a juvenile detention facility.

{59} After thoroughly reviewing the record, we find that appellant was not "in custody" for *Miranda* purposes at the time he made his initial, oral statement to Detective Hayes. Appellant was not under formal arrest nor was there a restraint on appellant's freedom of movement "of the degree associated with a formal arrest." *Beheler*, 463 U.S.

at 1125 [103 S.Ct. 3517]. At the time of the interview, appellant was at the police station for his protection and because of his status as a potential witness. The record shows no restrictive elements to the interview. The interview did not take place in an interrogation room, but at a desk. Detective Hayes' testimony, which the juvenile court must have found credible, shows that he was attempting to obtain information from appellant about the incident. Detective Hayes did not place appellant in custody as defined in *Miranda* until after appellant gave his confessional narrative.

{60} Detective Hayes did testify that appellant would not have been "free to go" prior to making his oral statement, but simply because the department would not release a 13 year old to the high crime area where the station was located without an adult to care for him. Detective Hayes made clear in his testimony that appellant "was free to stop speaking" to him. After reviewing the transcript of the suppression hearing, this court does not find that appellant was subjected to the restraint associated with a formal arrest. Therefore, the juvenile court properly denied appellant's motion to suppress the oral statement.

{61} We now address appellant's argument that the court should have suppressed his written statement because appellant did not voluntarily waive his *Miranda* rights. In determining whether appellant voluntarily waived his *Miranda* rights, we consider "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Green*, 90 Ohio St.3d 352, 366, 2000 Ohio 182 [738 N.E.2d 1208].

{62} Detective Hayes testified that he read appellant's *Miranda* rights to him, and reviewed each individual right with him in detail. Detective Hayes also testified that he and appellant discussed the meaning of individual terms in the *Miranda* warnings such as "court" and "lawyer." Detective Hayes explained the right to remain silent by telling appellant he could "stop talking * * * whenever he wants." According to Detective Hayes, appellant acknowledged that he understood what Detective Hayes meant. Detective Hayes testified that he did not have any concerns about appellant's English language abilities. Appellant told Detective Hayes that he wanted to talk, signed a written waiver of his *Miranda* rights, and signed a written statement consistent with his previous oral statement.

{63} Dr. Hopes testified for the defense at the suppression hearing. She testified that appellant did not have the ability to comprehend all of his *Miranda* rights. According to Dr. Hopes, appellant could understand the concept of being entitled to a lawyer, and that what he said could be told to a judge. However, Dr. Hopes testified that appellant was not capable of understanding what it meant for his statements to be "used against him."

{64} With respect to the test set forth in *Green*, 90 Ohio St.3d at 366 [738 N.E.2d 1208], the record shows no evidence of physical deprivation, mistreatment, or the existence of threat or inducement. The record also does not show that the interview of appellant was of a great length. Appellant was 13 years old at the time of the interview. With respect to law enforcement contact, appellant had been arrested once before, and had spoken to a police sergeant once on the telephone. With respect to appellant's mentality, his overall IQ was in the low-

average range. As to other relevant circumstances, appellant was under the emotional stress of having just learned that his baby brother died.

{65} Based on the totality of the circumstances, we find that appellant's waiver of his *Miranda* rights was voluntary. As stated above, there is no evidence of physical deprivation, mistreatment, or improper coercion. Further, the length, intensity, and frequency of the interrogation were not great. Additionally, Detective Hayes' testimony shows that he carefully explained to appellant in simple terms the *Miranda* rights he was waiving, and that appellant stated he understood those rights. The record does not support the conclusion that appellant's age and mentality prevented him from understanding the rights he was waiving. As Dr. Hopes testified, appellant may not have been capable of understanding all the nuances of his *Miranda* rights. However, under the totality of the circumstances, we find that appellant could understand the rights he was waiving. His waiver was therefore voluntary. Accordingly, the juvenile court did not err in failing to suppress appellant's written statement.

(Doc. 10, Exh. 31 at 14–19).

█ The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege against self-incrimination applies to the States through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436,

444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the Supreme Court held:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning ... [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 478–79, 86 S.Ct. 1602. These so-called *Miranda* warnings are intended to guard against the coercion inherent in a police-dominated environment whereby the interplay between interrogation and custody would " 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (quoting *Miranda*, at 457–58, 86 S.Ct. 1602).

█ The Fifth Amendment prohibits the use of a defendant's compelled testimony by the prosecution in its case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 306–07, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Statements obtained in violation of *Miranda* must be excluded from the prosecution's case-in-chief even if the statements were otherwise voluntary within the meaning of the Fifth Amendment. *Elstad*, 470 U.S. at 307, 105 S.Ct. 1285. A *Miranda* violation creates an irrebuttable presumption of compulsion, requiring the suppression of all statements made in violation of *Miranda* for purposes of the prosecution's casein-chief. *Id.* at 306–07 and n. 1, 105 S.Ct. 1285.

**A. Was petitioner "in custody" at the time he made his initial statement to police?**

 *Miranda* warnings are not required to be administered to everyone whom police officers question. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). While "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it simply by virtue of the fact that the police officer is part of a law enforcement system," *Miranda* warnings are required only in the context of a "custodial interrogation." *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711. A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. *See also Beckwith v. United States*, 425 U.S. 341, 346–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

The test for determining whether a given person is "in custody" is an objective one. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *see also Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). In determining whether a suspect is in custody, a court is to consider the totality of the circumstances and "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526 (quoting *Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138).

In *Alvarado*, the Supreme Court set forth the current *Miranda* custody test:

Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Alvarado*, 541 U.S. at 663, 124 S.Ct. 2140 (quoting *Thompson v. Keohane*, 516 U.S. at 112, 116 S.Ct. 457); *see also California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (*per curiam*); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam).

In *Alvarado*, the Supreme Court held that the state court's application of clearly established law was not unreasonable when the court failed to consider a seventeen-year-old habeas petitioner's age and lack of experience with law enforcement when evaluating whether the petitioner was "in custody" for purposes of *Miranda*. The Supreme Court stated that age and experience are subjective factors often unknown to police officers and that the "custody" inquiry is an objective one designed to give clear guidance to the police. The Court noted that its prior decisions "applying the *Miranda* custody test have not mentioned the suspect's age, much less mandated its consideration." 541 U.S. at 667, 124 S.Ct. 2140.[7] The Supreme Court

---

**7.** Because of the AEDPA deferential standard of review in habeas cases, some courts have not read the plurality decision in *Alvarado* as a definitive ruling precluding the consideration of youth as part of the objective *Miranda*

also stated that a suspect's prior history with law enforcement may not predict the likelihood with which a suspect may feel free to leave and is therefore not relevant to the custody determination. *Id.* at 668–69, 124 S.Ct. 2140.

The *Alvarado* Court considered the following "objective" factors to be consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave: the police did not transport the petitioner to the station or require him to appear at a particular time; they did not threaten him with arrest; the petitioner's parents remained in the lobby during the interview, suggesting a brief interview; the police focused on the other suspect's crimes during the interview and appealed to petitioner's interest in telling the truth; petitioner was offered two breaks; and at the end of the interview the petitioner went home with his parents. *Id.* at 664–65, 124 S.Ct. 2140. On the other hand, the Supreme Court recognized several factors weighed in favor of an "in custody" finding: the petitioner was interviewed at a police station; the interview took two hours, four times longer than the 30–minute interview in *Mathiason*;[8] the police officer never told the petitioner he was free to leave; the petitioner was brought to the station by his parents rather than arriving on his own accord, making the extent of his control over his presence unclear; and his parents asked to be present at the interview but were rebuffed. The Supreme Court determined that this was a close case over which "fair-minded jurists could disagree" and, recognizing that it was bound by the AEDPA deferential standard of review, the Court upheld the state court's determination as not contrary to or an unreasonable application of clearly established federal law. *Id.* at 664, 665, 124 S.Ct. 2140.

In the instant case, the Ohio Court of Appeals determined that petitioner was not in custody at the time he made his initial statements to Detective Hayes. The appeals court noted that petitioner was not under formal arrest and was taken to the police station for his own protection and as a potential witness. It also found relevant that the interview took place at a desk and not in an interrogation room and that there were "no restrictive elements" to the interview. In addition, the Court of Appeals stated that Hayes was attempting to gain information about the incident and that petitioner was "free to stop" talking to Hayes at any time.

The state court of appeals' adjudication of the custody issue involved an unreasonable application of federal law because it failed to consider the totality of the circumstances under *Alvarado* when it made

---

custody analysis, citing Justice O'Connor's concurrence which notes that "[t]here may be cases in which a suspect's age will be relevant to the 'custody' inquiry under *Miranda*." 541 U.S. at 669, 124 S.Ct. 2140. Justice O'Connor stated *Alvarado* was not such a case because the petitioner was five months shy of his eighteenth birthday at the time of his interview and it is "difficult to expect police to recognize that a suspect is a juvenile when he is close to the age of majority." 541 U.S. at 669, 124 S.Ct. 2140. *See U.S. v. Panak,* 552 F.3d 462, 471 (6th Cir.2009) ("there is some debate about the relevance of an individual's age in this setting") (comparing *Alvarado,* 541

U.S. at 666–68, 124 S.Ct. 2140) (plurality opinion) (suggesting that a suspect's age is irrelevant to the custody analysis), *with id.* at 669, 124 S.Ct. 2140 (O'Connor, J., concurring) (stating that "[t]here may be cases in which a suspect's age will be relevant to the 'custody' inquiry under *Miranda*." ).

8. The questioning in *Mathiason* was held non-custodial where the suspect voluntarily came to the police station, was informed he was not under arrest, and was permitted to leave after the interview which lasted thirty minutes. 429 U.S. at 495, 97 S.Ct. 711.

its custody determination. The state court ignored numerous objective factors which, under Supreme Court precedent, point to the conclusion that petitioner was in custody at the time he gave his initial statement to police implicating himself in his brother's death.

Sometime prior Detective Hayes' arrival at the station at 2:00 a.m., thirteen-year-old petitioner and his siblings were transported to the police station. (Doc. 10, Exh. 71, Motion to Suppress Hearing June 10, 2004 at Tr. 10). Petitioner was taken to the station by the police rather than appearing voluntarily on his own accord or being brought there by a parent. *Cf. Mathiason*, 429 U.S. at 495, 97 S.Ct. 711 (fact that defendant came to police station voluntarily suggested that he was not in custody). Petitioner and his younger siblings sat on chairs by the front desk officer who could keep an eye on the children. (*Id.*, Tr. 10–12, 16, 32–33). At 2:20 a.m., petitioner was separated from his siblings and taken to a separate office for questioning by Detective Hayes. (*Id.*, Tr. 12). Neither petitioner's mother nor any other responsible adult accompanied petitioner to the police station or was present during questioning. (*Id.*, Tr. 12, 33). Petitioner was never told he was not under arrest before being questioned. *Cf. Mathiason*, 429 U.S. at 495, 97 S.Ct. 711 (fact that petitioner immediately informed he was not under arrest weighed against in custody finding). Petitioner was not offered any breaks or told he was free to leave. *Cf. Alvarado*, 541 U.S. at 664–665, 124 S.Ct. 2140. Petitioner was advised by Detective Hayes that it was his job to investigate what happened to petitioner's brother. (*Id.*, Tr. 47). After ten minutes of "rapport building," petitioner was asked what happened that night at the apartment. (*Id.*, Tr. 14–17, 44). When petitioner told Detective Hayes that his brother had fallen down the stairs, Hayes told petitioner he did not believe him and advised petitioner that he'd "been investigating crimes against children for some time" and did not believe the injuries were caused by the fall. (*Id.*, Tr. 17). They discussed some of the injuries observed by Hayes who had previously gone to the hospital. Hayes again asked petitioner what happened. (*Id.*, Tr. 18). Petitioner repeated that his brother fell down the stairs. (*Id.*, Tr. 18). Hayes then told petitioner his brother had died and petitioner began to cry. (*Id.*, Tr. 18). Hayes repeated that he did not believe petitioner's story and told petitioner he was lying. (*Id.*, Tr. 18). At that point, petitioner made statements implicating himself in his brother's death. (*Id.*, Tr. 19–21, 70). By this time, it was 3:00 in the morning and petitioner had been questioned for approximately 40 minutes. (*Id.*, Tr. 21). Throughout the questioning, there was no parental or adult presence that could have served to mitigate the coercive environment of being questioned by police. *See Alvarado*, 541 U.S. at 665, 124 S.Ct. 2140 (noting that exclusion of parents from interview might reasonably make suspect feel more restricted than otherwise). Petitioner was "not free to leave" the police station at any time, given the time of night, his age, and the location of the station house. (*Id.*, Tr. 54–55). *Alvarado*, 541 U.S. at 665, 124 S.Ct. 2140. Although Detective Hayes testified that petitioner was "free to stop speaking with [him]" (*Id.*, Tr. 54), petitioner was not specifically advised of this fact until after he gave his incriminating statements and was *Mirandized*. (*Id.*, Tr. 64). According to Detective Hayes, he did not advise petitioner of his *Miranda* rights until he asked several "clarifying" questions to verify petitioner's story with the injuries Hayes observed on the child's body and determined petitioner was probably telling the truth. (*Id.*, Tr.

52–54, 71). At the conclusion of the interview, petitioner was charged and taken to a juvenile detention facility. *Cf. Alvarado,* 541 U.S. at 664, 124 S.Ct. 2140 (suspect allowed to leave at end of interview); *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 (same). The totality of these factors point to the conclusion that a reasonable person in petitioner's position would not feel free to terminate the questioning and leave.

The factors relied upon by the state court for its decision that petitioner was not in custody do not make the court's conclusion reasonable. The Ohio Court of Appeals found relevant the fact that petitioner was brought to the station as a potential witness and for his own protection. Yet, if "[a] policeman's unarticulated plan," *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138, or "subjective views" *Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526, have no bearing on the objective question of whether an individual is "in custody" at any particular time, then the fact that Detective Hayes' initially viewed petitioner as a witness, and not a suspect, and his reasons for wanting to questioning petitioner have no bearing on the objective circumstances surrounding whether petitioner was "in custody." They do not make the circumstances of a thirteen-year old juvenile being questioned by a police officer at 3:00 in the morning any less coercive. The subjective reasons for petitioner's transport to the station, whether for his "protection" or not, are not relevant to whether a reasonable person in petitioner's circumstances would feel free to leave. There is no evidence petitioner was ever told he was not under arrest, free to leave, or did not have to talk to Detective Hayes.

The state court also found relevant that the questioning did not take place in an interview room, but in the detective's office which held a desk and side chair. Yet, petitioner was separated from his siblings and taken to a private area prior to being questioned by Detective Hayes. Although the detective's office contained several desks and chairs suggesting a more spacious setting than an interview room, the questioning still occurred in a police-dominated atmosphere apart from petitioner's siblings, parent, or any other supportive third-party. The fact that the questioning took place at a desk does not support the conclusion that a reasonable person in petitioner's situation would have felt free to terminate Detective Hayes' questioning and leave.

Finally, the Court of Appeals ignored the facts supporting a finding of "custody" under *Alvarado* and *Mathiason.* Petitioner did not voluntarily appear for questioning at the police station. The police never contacted petitioner's parent prior to questioning petitioner, and petitioner was alone when questioned by Detective Hayes. He was never offered a break and not informed that he could refuse to answer Detective Hayes' questions. Petitioner was separated from his siblings and parent and questioned for approximately 40 minutes before giving the incriminating statements. Petitioner was not told he was free to leave, and in fact Detective Hayes testified petitioner was not free to leave the police station. Petitioner was not released after questioning, but rather placed under arrest. *See Alvarado,* 541 U.S. at 664–65, 124 S.Ct. 2140; *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711. While there was no formal arrest at the time of the initial questioning, the objective circumstances surrounding petitioner's questioning show that the restraint on petitioner's freedom of movement was significant and to the degree that a reasonable person in petitioner's situation would not have felt he was free to leave at will. Under the totality of the circumstances, the Court concludes that the Ohio Court of Appeals' determination of non-custody was contrary to and an unreasonable application of federal law as determined by the Supreme Court.

## B. Was petitioner subject to interrogation?

The procedural safeguards set forth in *Miranda* "are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Miranda* warnings must be given when "a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–301, 100 S.Ct. 1682. Interrogation includes not only express questioning by police, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. An "incriminating response" can be inculpatory or exculpatory, and is one that the State may seek to use against a defendant at trial. *Id.* at 302, n. 5, 100 S.Ct. 1682.

In the instant case, the state court of appeals never addressed the question of whether petitioner was subjected to an interrogation in a custodial setting because it unreasonably determined petitioner was not in custody. This Court's de novo review of the issue indicates that petitioner was subjected to express questioning by Detective Hayes. His incriminating responses were the product of questioning initiated by Detective Hayes and in direct response to Hayes' express inquiries. Therefore, petitioner was subject to a custodial interrogation requiring *Miranda* warnings.

## C. Is the second confession tainted by the first confession?

As discussed above, the Court determines that petitioner was subjected to a custodial interrogation during which he was not given *Miranda* warnings. The admission of such statements at trial therefore violated petitioner's right against self-incrimination. However, petitioner gave a second oral and written statement after Detective Hayes advised petitioner of his *Miranda* rights. The question for this Court is whether the *Miranda* warnings given after the first unwarned statement but before petitioner's second statement were effective. If not, then the admission of petitioner's incriminating statements at trial violated petitioner's right against self-incrimination. In answering this question, the Court reviews the Supreme Court's decisions in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which addressed the admissibility of inculpatory statements made pre- and post-*Miranda* warnings, a scenario the Sixth Circuit has described as "*Miranda*–in–the–Middle Interrogations." *See U.S. v. Pacheco–Lopez,* 531 F.3d 420, 425 (6th Cir.2008).

In *Elstad,* the Supreme Court addressed "whether an initial failure of law enforcement officers to administer the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), without more, 'taints' subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights." 470 U.S. at 300, 105 S.Ct. 1285. In that case, police officers went to Elstad's home with a warrant for his arrest after he had been implicated in the burglary of a neighbor's home. While during a brief stop in the suspect's living room, the officer stated he thought Elstad had been involved in the burglary. Elstad then made the admission that "[he] was there." Elstad was then transported to the police station and one hour later advised of his *Miranda* rights. Elstad indicated he understood his rights and wished to speak to the officers. He then confessed to his involvement in the burglary. The Supreme Court rejected the argument that

Elstad's police station confession was "tainted" by his earlier admission at his home made without *Miranda* warnings because his earlier statement let the "cat out of the bag." The Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. 1285. The Supreme Court concluded:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

470 U.S. at 314, 105 S.Ct. 1285. In other words, "if the prewarning statement was voluntary, then the postwarning confession is admissible unless it was involuntarily made despite the *Miranda* warning." *U.S. v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007).

In *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court addressed the admissibility of statements made after *Miranda* warnings, but where the suspect had already confessed during an earlier unwarned interrogation pursuant to a purposeful two-step interrogation scheme employed by the police department. The suspect in *Seibert* was taken to the police station and questioned for thirty to forty minutes by a police officer who intentionally refrained from giving the *Miranda* warnings until the suspect confessed.

The suspect was given a twenty-minute break, then advised of her *Miranda* rights. Questioning resumed using the same questions which elicited the initial confession and the suspect again confessed.

A majority of the Supreme Court in *Seibert* held the second warned statements elicited under the question-first, warn later technique to be inadmissible. A plurality of four justices held the *Miranda* warnings given pursuant to a question-first practice were ineffective in advising a suspect that he "had a real choice about giving an admissible statement at that juncture" or "could choose to stop talking even if he had talked earlier." *Id.* at 612, 124 S.Ct. 2601. The plurality reasoned that when an individual has just incriminated himself by answering a series of detailed questions about his involvement in criminal activity, with little incriminating potential left unsaid, a midstream warning that instructs him of his right to refrain from answering those exact kinds of questions may fail to "reasonably convey that he could choose to stop talking." *Id.* at 612, 124 S.Ct. 2601 (plurality opinion). The plurality stated:

> For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 612, 124 S.Ct. 2601. The plurality determined that "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Id.* at 613–14, 124 S.Ct. 2601.

The justices looked to five factors impacting whether *Miranda* warnings delivered midstream can be effective to accomplish their objectives: (1) the completeness and detail involved in the first round of questioning; (2) the overlapping content of the statements made before and after the warning; (3) the timing and setting of the interrogation; (4) the continuity of police personnel during the interrogations; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615, 124 S.Ct. 2601.[9] The *Seibert* plurality distinguished *Elstad*, explaining that the *Elstad* Court "took care to mention that the officer's initial failure to warn was an 'oversight,'" 542 U.S. at 614, 124 S.Ct. 2601, and that "on the facts of that case, the Court thought any causal connection between the first and second responses to the police was 'speculative and attenuated.'" *Id.* at 615, 124 S.Ct. 2601 (citing *Elstad*, 470 U.S. at 313, 105 S.Ct. 1285). The plurality noted that "a reasonable person in [Elstad's] shoes could have seen the station house questioning as a new and distinct experience" and, therefore, "the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Id.* at 615–16, 124 S.Ct. 2601.

In contrast, the unwarned interrogation of the suspect in *Seibert:*

> was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.

When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used . . . . . It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Id.* at 616–17, 124 S.Ct. 2601 (plurality opinion).

Justice Kennedy, in his concurring opinion, determined that statements resulting from an intentional question-first, warn later practice must be suppressed unless curative measures are taken "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* at 622, 124 S.Ct. 2601. Justice Kennedy believed that in cases not involving a deliberate two-step interrogation technique, *Elstad* should control the admissibility of postwarning statements. *Id.* (Kennedy, J., concurring).

The Sixth Circuit has not resolved the issue of whether the *Seibert* plurality or Justice Kennedy's concurrence operates as the controlling precedent. *See United*

---

**9.** The *Seibert* plurality noted that "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interro-gation), the focus is on facts apart from intent that show the question-first tactic at work." 542 U.S. at 617, n. 6, 124 S.Ct. 2601.

*States v. Pacheco–Lopez,* 531 F.3d 420, 427 n. 11 (6th Cir.2008).[10] Therefore, the undersigned analyzes the instant case under both the *Seibert* plurality and Kennedy concurrence.

Examining the instant case under the *Seibert* plurality factors, the undersigned concludes that petitioner's statements were the product of a continuous unwarned sequence of questioning and the *Miranda* warning was thus ineffective.

The first factor is the completeness and detail of the questions and answers in the first round of interrogation. During his initial interrogation of petitioner, Detective Hayes' questioned petitioner at length until he obtained a confession that petitioner had harmed his brother. Hayes repeatedly tested petitioner's responses to what happened that night and questioned his veracity. (Doc. 10, Exh. 71, Motion to Suppress Hearing June 10, 2004 at Tr. 17–21, 70). Even after petitioner admitted he choked his brother, Hayes continued to ask petitioner questions "for clarification" and to ensure "he was telling me the truth about what had occurred here . . . ." (Doc. 10, Exh. 71, Motion to Suppress Hearing June 10, 2004 at Tr. 53–54, 70). When petitioner stated he put his hands around the child's neck and choked him, Hayes asked petitioner, "Why would you do that?" which elicited further incriminating statements from petitioner. (*Id.* at Tr.

20). Hayes testified, "I did ask him a few questions just to clarify some things, just to verify that what he was telling me matched what I had seen on the child's body. And then after I determined that what he had told me was probably the truth or at least likely to have been the truth, we mirandized him." (*Id.* at 70–71). Hayes' questions were detailed, probing and precise. This factor supports a finding that the *Miranda* warning was ineffective.

The second factor, the overlapping content of the two statements, also supports a finding of ineffectiveness. According to Detective Hayes' testimony,[11] petitioner's pre- and post-*Miranda* warning statements both revealed the same information: that petitioner struck the child with a metal bar and the child began to cry; that petitioner was unable to console the crying child and became angry; that petitioner attempted to give the child a bottle, but the child threw it away; that petitioner choked the child around the neck; and that petitioner attempted to perform pulmonary resuscitation on the child without success. (Compare Doc. 10, Exh. 71, Motion to Suppress Hearing June 10, 2004 at Tr. 19–20, with Tr. 27). Detective Hayes testified that petitioner's post-warned statement "was fairly close to what he told me before" with the exception of new information that the metal bar came off part

**10.** Generally, where "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgements on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks omitted). While that might seem to be Justice Kennedy's concurrence in *Seibert,* the Sixth Circuit seemingly recognized the problems with adopting Justice Kennedy's approach, citing *United States v. Carrizales–Toledo,* 454 F.3d 1142, 1151 (10th Cir.2006) and *United States*

*v. Rodriguez–Preciado,* 399 F.3d 1118, 1139–42 (9th Cir.2005) (Berzon, J., dissenting). In *Pacheco–Lopez,* the Sixth Circuit declined to resolve the issue finding that under either the plurality opinion or Kennedy concurrence the suspect's statements must be suppressed. 531 F.3d at 427, n. 11.

**11.** Petitioner's statements to Detective Hayes were neither audiotaped nor videotaped "per department policy." (Doc. 10, Exh. 71, Trial Transcript at 371). Therefore, the Court must examine the testimony given at the Motion to Suppress Hearing.

of the bed. (*Id.* at Tr. 27). After petitioner was given *Miranda* warnings, Detective Hayes "told him we were going to go through the story again." (*Id.* at Tr. 56). The content of the two statements were virtually identical.

The last three factors, the timing and setting of the first and the second statement, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first, further support a finding that the *Miranda* warning was ineffective. Detective Hayes conducted the first and second interrogation in the same location without any break between the two sets of questions. *See Pacheco–Lopez,* 531 F.3d at 427. The first interrogation began at 2:20 a.m. and ended at 3:00 a.m. (Doc. 10, Exh. 71, Motion to Suppress Hearing June 10, 2004 at Tr. 12, 21). At that point, Detective Hayes "grabbed Sergeant Malone and explained to him what had just occurred and I told-asked Sergeant Malone if he would sit in with me just for a brief second while I advised Jorge of his *Miranda* rights. And I told Jorge of because of what he has just told me, I had to advise him of certain rights." (*Id.* at Tr. 21–22). Detective Hayes started to write up petitioner's written statement at 3:11 a.m., a mere eleven minutes after petitioner completed his pre-*Miranda* warning statement and was given the *Miranda* warning. (*Id.* at Tr. 28). Hayes completed typing the statement at 4:00 a.m. *Id.* The only time Detective Hayes left petitioner alone in the office was to speak with Detective Marcum, but only for "a few minutes." (*Id.* at Tr. 69). Like the suspect in *Seibert,* after Detective Hayes completed the first set of questions, there was little, if anything left unsaid to incriminate petitioner. When petitioner was then informed of his *Miranda* rights, neither Detective Hayes nor Sergeant Malone advised petitioner that his previous statements could not be used against him.

Thus, nothing was said to dispel the probable misimpression that the advice that anything petitioner said could be used against him also applied to the details of his initial inculpatory statements. *Seibert,* 542 U.S. at 616, 124 S.Ct. 2601; *see also Pacheco–Lopez,* 531 F.3d at 427. The absence of such advice is "clearly a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation." *Seibert,* 542 U.S. at 616, n. 7, 124 S.Ct. 2601. The sequence, circumstances, and close proximity of the first and second series of questioning were such that a suspect in petitioner's position would reasonably "regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before" and that petitioner would not have understood the *Miranda* warnings to mean he retained a choice about continuing to talk to Detective Hayes. *Id.* at 617, 124 S.Ct. 2601. The five *Seibert* factors identified by the plurality demonstrate that the *Miranda* warning in this case was ineffective.

Analyzing this case under Justice Kennedy's concurrence yields a similar result. Justice Kennedy stated that *Seibert* requires that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step [question first, warn later] strategy was employed." *Id.* at 622, 124 S.Ct. 2601. Where the question-first technique is utilized, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* The "curative measures" envisioned by Justice Kennedy include "an additional warning that explains the likely inadmissibility of the prewarning custodial statement" or a "substantial break in time and circumstances between the prewarning statement and the *Miranda* warning

[which] ... allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* (Kennedy, J., concurring).

Unlike *Seibert*, there was no "candid" admission that the police here employed a question-first, warn later tactic. *Cf. Seibert*, 542 U.S. at 617, n. 6, 124 S.Ct. 2601. Nevertheless, the facts strongly suggest such a tactic was employed by Detective Hayes given the circumstances surrounding the two sequences of questioning. Assuming, *arguendo*, the deliberate tactic was employed, there were no curative measures taken to ensure that the subsequently administered *Miranda* warning was effective. *Id.* at 622, 124 S.Ct. 2601. Petitioner was never advised that his earlier statements could not be used against him. Nor was there a substantial break in time between the two series of questions to allow petitioner to appreciate a change in circumstances in the nature of the interrogations and the consequences of his responses to the initial and subsequent set of questions. Thus, the effectiveness of the *Miranda* warning when actually given was significantly diminished by use of the two-step process.

Assuming, *arguendo*, that Detective Hayes' initial and subsequent questioning were not part of a deliberate two-step process and *Elstad* controls the admissibility of petitioner's second statement, *Seibert*, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring), the result is the same. Under *Elstad*, the "subsequent administration of *Miranda* warnings to a suspect who has given a *voluntary* but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314, 105 S.Ct. 1285 (emphasis added). Thus, the application of *Elstad* in this context turns on whether petitioner's first statement was "voluntary." *See United States v. Crowder*, 62 F.3d 782, 786

(6th Cir.1995) (explaining that "[a] suspect's warned confession, given after he made unwarned and inculpatory statements, is admissible if the unwarned statements were voluntary"), *cert. denied*, 516 U.S. 1057, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996).

The question of voluntariness must be answered by reviewing the totality of the surrounding circumstances and the entire course of police conduct. *Elstad*, 470 U.S. at 318, 105 S.Ct. 1285; *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Court must assess factors including the age, education and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041; *see also United States v. Mahan*, 190 F.3d 416, 422–23 (6th Cir.1999) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)).

The Supreme Court has cautioned that special care must be taken when evaluating the voluntariness of a juvenile's confession. *Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). In *Haley*, the Supreme Court held involuntary the confession of a 15–year–old boy who was taken from his home to the police station and questioned for five hours from midnight on before he confessed. *Id.* at 598, 68 S.Ct. 302. The Supreme Court determined that the "age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction." *Id.* at 600–01, 68 S.Ct. 302. *Cf. Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct.

2560, 61 L.Ed.2d 197 (1979) (sixteen-year-old suspect's confession found voluntary where no evidence of improper interrogation tactics, suspect had considerable experience with law enforcement, his rights were fully explained, and no facts showed he was unable to understand his rights). When these factors are considered in the context of the instant case, the undersigned concludes that the initial unwarned confession was involuntary.

Petitioner did not go to the police station voluntarily, but was taken to the station by police officers. He was only 13 years old at the time, and had limited intellectual abilities. While he attended school for seven years, his attendance was sporadic. (Doc. 10, Exh. 71, Motion to Suppress Hearing June 10, 2004 at Tr. 46; Exh. 71, Motion for Competency Hearing Dec. 4, 2003 at Tr. 19). He spoke primarily Spanish, moved back and forth between the United States and Mexico, and spent several years in Mexico where he did not attend school. (*Id.*, Suppression Hearing at Tr. 85; Competency Hearing at Tr. 19, 20). Dr. Hopes testified petitioner had deficits in his ability to understand the English language and in his reasoning and judgment. His IQ was in the borderline range of mental retardation and subtests showed he functioned at the moderately retarded range in his reasoning and judgment ability. (*Id.*, Suppression Hearing at Tr. 77–78; Competency Hearing at Tr. 16). Dr. Hopes testified that petitioner struggled with verbal comprehension which was "quite poor." (*Id.*, Suppression Hearing at Tr. 79). Dr. Hopes testified that petitioner appeared to do better with verbal comprehension than he actually did because he was able to select the correct words in English when he was the one communicating, but his understanding of what other people said to him was more impaired. *Id.* Dr. Hopes also administered tests to evaluate competency to confess and the comprehension of *Miranda* rights of juveniles

and adults. Dr. Hopes testified that petitioner had an understanding level of approximately a ten or eleven year old with a below average intelligence. (*Id.*, Suppression Hearing at Tr. 80–84). While there is evidence that petitioner had been arrested once before and had been to the police station one time (*Id.*, Suppression Hearing at Tr. 14), there is no evidence of the circumstances surrounding that arrest and whether he was ever interrogated or received *Miranda* warnings. Petitioner was offered food at one point in the interrogation, although it is not clear from Detective Hayes' testimony whether it was before or after petitioner was advised of his *Miranda* rights. (*Id.*, Suppression Hearing at Tr. 15). However, petitioner was never offered a bathroom or other break, or offered something to drink. (*Id.*, Suppression Hearing at Tr. 15, 48). Detective Hayes repeatedly accused petitioner of lying and petitioner was emotionally distraught having just learned his brother had died before he finally confessed. Petitioner was never advised of his *Miranda* rights during the initial questioning phase and never told he did not have to answer Detective Hayes' questions. There was no parent or other supportive adult present during the questioning, nor was petitioner offered that opportunity. The questioning took place at the police station and began at 2:20 a.m. While the initial questioning lasted approximately 40 minutes and was not particularly lengthy, Detective Hayes' challenges to plaintiff's truthfulness could be considered coercive to a 13–year–old boy functioning in the borderline mentally retarded range of intelligence under the circumstances. The undersigned cannot say that, under the totality of the circumstances, petitioner's initial inculpatory statements were voluntary.

Under *Elstad*, "if [a suspect's] first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances." *Pacheco–Lopez*, 531 F.3d at 429 (citing *Seibert*, 542 U.S. at 605, 124 S.Ct. 2601; *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285). In *Pacheco–Lopez*, the Court of Appeals stated that "*Elstad* . . . requires that '[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.'" 531 F.3d at 429 (quoting *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285). The Court of Appeals concluded that the defendant's post-*Miranda* statements must be suppressed given the presence of the three *Elstad* factors which suggested that a finding of coercion carried over to the second statement. *Id.* at 430. *Cf. Coomer v. Yukins*, 533 F.3d 477, 491 (6th Cir.2008) (finding initial voluntary confession at suspect's home did not taint second confession made at police station where several hours passed since first confession and suspect specifically informed she was in custody).

Likewise, in the instant case, the time between confessions, the identity of the place of interrogations, and the identity of interrogators indicate petitioner's second confession was tainted by his prior statement. *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285. There was an eleven-minute gap between petitioner's first unwarned confession and his second confession, a time-gap which was taken up by the *Miranda* warning itself. Unlike the suspect in *Elstad* who at his home admitted to being at the scene of the crime and then one hour later at the police station admitted to the details of the crime after being *Mirandized*, petitioner's first and second statements occurred at the police station and in the detective's office within a mere eleven min-

utes of each other. In addition, petitioner was questioned both pre- and post-*Miranda* warning by only one person: Detective Hayes. Nor was there any evidence that petitioner was aware that his earlier statements could not be used against him. He was not specifically advised of such, and the *Miranda* warning was insufficient to inform petitioner that he could choose whether to continue his confession in the second interrogation. The *Elstad* factors indicate that the coercive effect of the first confession carried over into the second, and that petitioner's second post-warned statements were admitted in error.

For these reasons, the undersigned concludes that the state court's ruling that petitioner's statements were admissible constitutes a decision that is contrary to clearly established federal law. *Schoenberger v. Russell*, 290 F.3d 831, 835 (6th Cir.2002); *Harris v. Stovall*, 212 F.3d 940, 943 & n. 1 (6th Cir.2000).

**D. Does the state court's admission of petitioner's confessions amount to harmless error?**

"Harmless error analysis applies to coerced confessions." *Coomer v. Yukins*, 533 F.3d 477, 488 n. 4 (6th Cir.2008) (citing *Arizona v. Fulminante*, 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Petitioner is not entitled to habeas corpus relief unless such error "had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Under the "harmless error" standard, if upon review of the entire record, the court is convinced that "the error did not influence the jury, or had but slight effect," the conviction must stand. *O'Neal v. McAninch*, 513 U.S. 432, 435–38, 115 S.Ct. 992,

130 L.Ed.2d 947 (1995); *Kotteakos v. United States,* 328 U.S. 750, 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). On the other hand, if there is "grave doubt" as to whether the constitutional error had such an effect "that error is not harmless." *O'Neal,* 513 U.S. at 436, 115 S.Ct. 992. "Grave doubt" means "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435, 115 S.Ct. 992. "Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand." *Barker v. Yukins,* 199 F.3d 867, 874 (6th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000) (citing *O'Neal,* 513 U.S. at 435–38, 115 S.Ct. 992).

 In this case, petitioner's statements were directly inculpatory and were admitted to prove essential elements of the State's case. Petitioner's confession was undoubtedly the strongest evidence of his guilt and was the only direct evidence he struck the child with a metal bar and choked the child around the neck. There was no independent evidence establishing how the child was injured. Other than petitioner's own statements, the prosecution introduced no evidence corroborating that petitioner hit the child with a metal bar or choked the child. Petitioner's own incriminating statements provided the crucial link between Dr. Burkhardt's testimony as to the cause of death and petitioner's actions as causing the victim's death "as a proximate result" of his commission of child endangering.[12] Petitioner's confessions were not cumulative of other evidence presented by the prosecution and were important to the State's case.

In addition, petitioner's confession was crucial to establishing the *mens rea* re-

quirement for the crime of child endangerment upon which the murder conviction was premised. The Ohio Court of Appeals relied on petitioner's confessions when finding sufficient evidence supported the jury's finding of "recklessness:"

{¶ 73} Appellant was indicted for child endangering under R.C. 2919.22(B)(1). That section provides that "no person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child[.]" Because the statute does not specify a mental state and does not indicate an intent to impose strict liability, the mental state of "recklessly" applies. R.C. 2901.21(B). A person acts "recklessly" when, "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶ 74} According to Detective Hayes' testimony, appellant told Detective Hayes that he hit the victim in the back with a metal bar. Appellant also told Detective Hayes that he choked the victim by putting his hands around the victim's neck. In his written statement, appellant stated that he struck the victim with the metal bar, causing a bruise on the victim's back, and that he did it "on purpose." In his written statement, appellant also stated that he grabbed the victim "by the front of the neck" until the victim stopped crying. Dr. Richard Burkhardt, the Butler County Coroner, testified that the victim had many contusions on his body, including multiple, recent contusions on his back. Further, Dr. Burkhardt testified that

---

**12.** The state appellate court noted: "In the murder count, the state alleged that appellant purposely caused the death of the victim as a proximate result of committing 'an offense of violence to wit: Endangering Children[.]' " (Doc. 10, Exh. 31 at 21 n. 1).

there was an injury to the victim's neck strap muscle. J.B.'s brother, A.B., testified that there were not bruises on the victim's back when he and his siblings were eating dinner earlier in the evening.

{¶ 75} Based on the above evidence in the record, we find sufficient evidence that appellant acted "recklessly" in abusing the victim. Specifically, we note appellant's written statement that he struck the victim with a metal bar "on purpose." See R.C. 2901.22(E) ("When recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element.") Accordingly, we overrule appellant's fourth assignment of error.

(Doc. 10, Exh. 31 at 21–22).

The undersigned is left with grave doubt that the improperly admitted confession did not influence the jury or had but a slight effect on its verdict. *O'Neal*, 513 U.S. at 445, 115 S.Ct. 992. As the Supreme Court has recognized: "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246 (internal quotations and citation omitted) (White, J., delivering the opinion of the Court as to this issue). In the absence of petitioner's inculpatory statements, the State would not have proven the critical elements of its case. Because the undersigned cannot say with certainty that the erroneous admission of petitioner's confession "had little or no impact on the judgment" in this case, *Barker*, 199 F.3d at 873, the undersigned concludes that the admission of petitioner's statements was

not harmless error. Therefore, the undersigned recommends that the petition for a writ of habeas corpus be granted and petitioner released from custody unless petitioner is granted a new trial within a time to be fixed by the district judge if this recommendation is adopted.

## V. WAS PETITIONER DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS AS ALLEGED IN GROUND SIX OF THE PETITION?

Ground Six of the petition asserts two claims of ineffective assistance of trial counsel.[13] First, petitioner claims that counsel was ineffective when he refused a plea offer without notifying petitioner that the offer was made. Second, petitioner claims counsel failed to consult with and seek the testimony of an expert witness to rebut the testimony of the coroner and establish a different cause of death. (Doc. 19 at 17).

### A. Petitioner's ineffective assistance of counsel claim based on counsel's failure to convey the plea offer to petitioner

On April 9, 2004, an informal pre-trial status hearing was held in petitioner's case at which the judge, the prosecutor, Greg Stephens, defense attorney, Bradley Carmella, and petitioner's Guardian Ad Litem, Nicole Stephenson, attended. (Doc. 10, Exh. 43, Exh. A, Affidavit of Nicole Stephenson, Esq., Guardian Ad Litem,). Petitioner was not present at this meeting. *Id.* At the pretrial, the State offered a plea bargain in which petitioner would plead

---

**13.** Petitioner has narrowed his sixth ground for relief based on the ineffective assistance of counsel to the two claims recited above. See Doc. 19 at 1, n. 1. Therefore, the Court declines to address the other claims of ineffective assistance of counsel alleged in the Statement of Facts portion underlying Ground Six of the petition.

guilty to an F–2 involuntary manslaughter charge (a second degree felony) and an F–3 child endangering charge (a third degree felony). *Id.* Petitioner's disposition would be confinement in the Department of Youth Serves for a minimum period of twelve months until he reached age 21 for involuntary manslaughter, and a minimum period of six months until he reached the age 21 for child endangering, with an aggregate disposition of a minimum total commitment of eighteen months with a maximum total commitment to age 21.[14] The case would also be removed from the adult criminal system, which carried a life sentence, and there would be no serious youthful offender designation. *Id.* Attorney Carmella refused the State's offer during this meeting. *Id.*

On April 15, 2004, Guardian Ad Litem Stephenson discussed the plea offer with petitioner. (Doc. 10, Exh. 43, Exh. A). Petitioner learned that the State had offered a plea deal and that his attorney turned it down. (Doc. 10, Exh. 43, Exh. A, Exh. B, Affidavit of Jorge Bucio). Petitioner informed Guardian Ad Litem Stephenson that he wanted to accept the State's offered plea. (Doc. 10, Exh. 43, Exh. A). Guardian Ad Litem Stephenson tried to contact trial counsel Carmella about petitioner's desire to accept the plea bargain but was unsuccessful. *Id.* She then contacted assistant prosecutor Greg Stephens at his office. *Id.* Stephens indicated the plea bargain was no longer available. *Id.* Petitioner states he was only informed of the plea offer by his defense counsel after counsel had turned down the offer. (Doc. 10, Exh. 43, Exh. B). Defense counsel has no memory of an offer being made. (Doc. 10, Exh. 43, Exh. E, Affidavit of Bradley Carmella).

### 1. Is the claim procedurally defaulted and waived for purposes of habeas review?

Respondent argues that petitioner's ineffective assistance of counsel claim based on counsel's failure to convey the plea offer to petitioner is procedurally defaulted and waived. (Doc. 10 at 73). Petitioner raised this claim in his state court petition for post-conviction relief pursuant to Ohio Rev.Code § 2923.51. (Doc. 10, Exh. 34). The trial court denied the claim on the basis of res judicata:

> The "plea bargain" claim is not part of the trial record, but could have been raised. It was not brought to the Court's attention and the matter proceeded to trial. The law in Ohio is clear that issues that could or were raised at trial or direct appeal are not subject to a Petition for Post Conviction Relief and are subject to dismissal without hearing based on res judicata. *State v. Perry,* 10 Ohio St.2d 175 [226 N.E.2d 104] (1967). The Court therefore finds that Petitioner's claims meet the *Perry* test and concludes they are subject to dismissal without further hearing.

(Doc. 10, Exh. 45). The Ohio Court of Appeals affirmed, concluding that the claim was barred by res judicata. (Doc. 10, Exh. 58). The state appellate court determined that "because appellant knew about the plea offer two months before the trial and discussed it with his guardian ad litem, the issue of his trial attorney's rejection of the plea offer could have been raised before trial, if not by the guardian ad litem, at least by appellant himself." *Id.* at 8.

Respondent contends that the doctrine of res judicata, the basis for the Ohio courts' determination, is an adequate and independent ground foreclosing federal ha-

---

**14.** *See* Ohio Rev.Code § 2152.16(d), (e).

beas review of petitioner's ineffective assistance of counsel claim. The undersigned disagrees.

■ Under Ohio law, the doctrine of res judicata generally precludes litigation of a constitutional issue in a post-conviction petition that was raised or could have been raised at trial or on direct appeal. *Ohio v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104, at syllabus ¶¶ 7, 9 (1967). This bar includes claims of ineffective assistance of trial counsel where the defendant is represented by new counsel on appeal and the "issue could fairly have been determined without resort to evidence dehors the record." *State v. Cole,* 2 Ohio St.3d 112, 443 N.E.2d 169, at syllabus (1982).

■ However, there are exceptions to the res judicata bar for claims of ineffective assistance of counsel raised in a petition for post-conviction relief. Where a defendant had the same counsel both at trial and on direct appeal, res judicata is not a bar since counsel cannot realistically be expected to raise his own ineffectiveness on appeal. *State v. Cole,* 2 Ohio St.3d 112, 443 N.E.2d 169 (1982). In addition, where a petitioner has new counsel on direct appeal and the ineffective assistance of counsel claim depends on evidence dehors the record, res judicata may not preclude a subsequent petition for post-conviction relief based on such claim if the issue could not have been fairly decided without resort to evidence outside of the record. *State v. Smith,* 17 Ohio St.3d 98, 101 n. 1, 477 N.E.2d 1128, 1131 (1985); *see also Cole,* 2 Ohio St.3d at 114, 443 N.E.2d at 171 ("Generally, the introduction in an R.C. 2953.21 petition of evidence *dehors* the record of ineffective assistance of coun-

sel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata.*"). The evidence outside the record must be competent, relevant, and material to defeat the application of res judicata. *State v. Lawson,* 103 Ohio App.3d 307, 315, 659 N.E.2d 362, 367 (Ohio App. 12th Dist.1995) (citing *State v. Smith,* 17 Ohio St.3d 98, 101, 477 N.E.2d 1128, 1131–1132, n. 1 (1985)).

■ In the instant case, petitioner presented competent and credible evidence by way of the affidavit of his Guardian Ad Litem and his own affidavit demonstrating that a plea agreement was offered by the State that was not communicated to petitioner in a timely fashion. This evidence is outside of the trial court record and could not have been raised or fully litigated on direct appeal. The Ohio Court of Appeals suggested that either 13–year–old petitioner or his guardian ad litem should have raised the issue of the plea deal before the trial. Yet, by the time petitioner was informed of the offer by the guardian ad litem, the State had already withdrawn the offer. In addition, neither the Ohio courts nor respondent has pointed to any authority showing that a juvenile defendant or a guardian ad litem in a juvenile delinquency action has a duty to raise the ineffective assistance of trial counsel during the trial proceedings. Moreover, new appellate counsel had no opportunity to raise the issue on direct appeal because the issue of a plea deal was not part of the trial record, as conceded by the trial court. The ineffective assistance of counsel claim could not have been decided fairly without resort to evidence dehors the record.[15] The ineffective assistance counsel claim in

---

**15.** The undersigned recognizes that insubstantial evidence dehors the record may not be used to circumvent the res judicata bar for issues that should have been raised on direct appeal. *See Cole,* 2 Ohio St.3d at 114, 443 N.E.2d at 171; *State v. Combs,* 100 Ohio App.3d 90, 97–98, 652 N.E.2d 205, 209–10 (Ohio App. 1st Dist.1994) (and cases cited therein). This is not such a case.

petitioner's case was properly raised at the first opportunity to the Ohio courts in the post-conviction proceeding and was not barred by res judicata.

■■■ Where a federal court on habeas corpus review is at odds with the state court on whether res judicata precludes review of an ineffective assistance of counsel claim on the basis of evidence dehors the record, habeas review is not necessarily precluded. *See White v. Mitchell,* 431 F.3d 517, 526–27 (6th Cir.2005), *cert. denied,* 549 U.S. 1047, 127 S.Ct. 578, 166 L.Ed.2d 457 (2006);[16] *Greer v. Mitchell,* 264 F.3d 663, 675 (6th Cir.2001).[17]

The Sixth Circuit has determined that "ineffective-assistance claims are not barred by res judicata under Ohio law when evidence outside the direct-appeal record is presented." *Hill v. Mitchell,* 400 F.3d 308, 314 (6th Cir.2005). In *Hill,* the state court of appeals denied a post-conviction petition as barred by res judicata despite the submission of dehors evidence, finding the issues raised in the affidavits submitted in support could have been presented on direct appeal. The Sixth Circuit disagreed with the Ohio court's application of the doctrine of res judicata and reviewed the claim de novo on habeas review. *Id.* at 313–14; *see also Morales v. Mitchell,* 507 F.3d 916, 937 (6th Cir.2007); *Richey v. Bradshaw,* 498 F.3d 344, 359–60 (6th Cir.2007).

Since the undersigned likewise finds that petitioner's claim was not barred by res judicata, the undersigned concludes that petitioner's first claim of ineffective assistance of counsel is not procedurally defaulted and should be reviewed on the merits.

**2. Did trial counsel refuse a plea offer without notifying petitioner that the offer was made?**

To demonstrate that counsel's performance was constitutionally ineffective, petitioner must show: (1) his counsel made such serious errors that he was not functioning as the counsel guaranteed by the Sixth Amendment; and (2) his counsel's deficient performance prejudiced the defense by undermining the reliability of the result. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688, 104 S.Ct. 2052. Under the "prejudice" prong of the *Strickland* test, petitioner must show that a "reasonable probability" exists that, but for his counsel's errors, the result of the criminal proceedings would have been different. *Id.* at 694, 104 S.Ct. 2052.

■■■ It is well-established that a criminal defendant has the right to effective assistance of counsel in deciding whether to reject or accept a proposed plea agreement. *See, e.g., Turner v. Tennessee,* 858 F.2d 1201, 1205 (6th Cir.1988) (and cases cited therein), *vacated on other grounds,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), *reinstated,* 726 F.Supp. 1113 (M.D.Tenn.1989), *aff'd,* 940 F.2d 1000 (6th Cir.1991), *cert. denied,* 502 U.S. 1050, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992); *see also Griffin v. United States,* 330 F.3d 733, 737 & n. 2 (6th Cir.2003) (and numerous cases

**16.** Misapplication of res judicata rule by Ohio appeals court on ineffectiveness assistance of counsel claim where petitioner submitted evidence outside the record in postconviction proceeding did not preclude federal habeas review.

**17.** "When the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded."

cited therein) (involving claim that counsel failed to inform the defendant of a plea offer); *Smith v. United States*, 348 F.3d 545, 552–53 (6th Cir.2003). "[A] defense attorney's failure to communicate a plea offer to his or her client constitutes deficient performance as a matter of law." *Guerrero v. United States*, 383 F.3d 409, 416 (6th Cir.2004) (citing *Griffin*, 330 F.3d at 737). Thus, a showing that the government extended a plea offer that was not communicated to à defendant by his counsel establishes the first prong of the *Strickland* test. *Guerrero*, 383 F.3d at 416.

In the instant case, the state courts did not reach the issue of counsel's alleged ineffectiveness in regards to a plea deal because it determined the claim was barred by res judicata. Therefore, this Court reviews this claim de novo without applying the deferential habeas standard set forth in section 2254(d). *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527; *Clinkscale*, 375 F.3d at 436.

 The totality of the evidence before the Court shows that the State offered petitioner a plea bargain prior to the commencement of his jury trial but that the offer was not communicated to petitioner until after it was rejected by his trial counsel. In this regard, the Court is presented with three affidavits.

The affidavit of petitioner's former counsel Mr. Carmella states, "I do not recall the State of Ohio offering a plea bargain to Jorge; however, I cannot remember what happened." (Doc. 10, Exh. 43, Exh. E at ¶ 7). Mr. Carmella's affidavit provides no further information on this issue.

The affidavit of Guardian Ad Litem Nicole Stephenson avers that at an informal pre-trial conference in April 2004, at which she, the prosecuting attorney, petitioner's counsel Mr. Carmella, and the judge were present, the prosecutor offered a plea bargain in which petitioner would plead to an F–2 involuntary manslaughter charge and an F–3 child endangering charge. The plea bargain included a stipulation that there would be no serious youthful offender designation and the case would be taken out of the adult system. The prosecutor also indicated that he may offer two F–3 charges after Jorge's mother's trial. Ms. Stephenson's affidavit states that Attorney Carmella indicated that if it is two F–3 charges, Jorge would plead. (Doc. 10, Exh. 43, Exh. A).

Ms. Stephenson states she met with petitioner on April 15, 2004 regarding the plea offer and at this meeting petitioner indicated he wished to accept the original plea offer. Ms. Stephenson states she telephoned Mr. Carmella about petitioner's desire to accept the plea bargain, but Attorney Carmella was not returning her calls. She therefore called the prosecutor herself and indicated petitioner would plead to the F–2 involuntary manslaughter and F–3 child endangering charges at the next hearing. However, the prosecutor informed her the deal was no longer available, but he would check with his supervisor to see if they would again consider the plea. Ms. Stephenson states she was then notified that the plea offer was not available. (Doc. 10, Exh. 43, Exh. A).

The affidavit of petitioner states that on one occasion when he met with his attorney prior to his trial, he was informed by his attorney that the prosecutor had made a plea offer which amended the murder charge to involuntary manslaughter and the F–2 child endangering charge to an F–3 child endangering charge. Petitioner states he was advised by his attorney that the attorney rejected the offer by the prosecutor. Petitioner states he was only informed of the offer after it had been turned down by his attorney. Petitioner states he was not given an explanation why the plea offer was not acceptable or why

his attorney did not talk to him before the offer was rejected. Petitioner states that had he been told about the plea offer, he would have accepted it. (Doc. 10, Exh. 43, Exh. B).

The undersigned finds that petitioner has established by clear and convincing evidence that a plea agreement was offered by the State. The affidavit of Ms. Stephens establishes that the prosecutor made a plea offer prior to trial to allow petitioner to plead guilty to less serious F–2 involuntary manslaughter and F–3 child endangerment charges in exchange for a plea of guilty. Confinement in the Department of Youth Services on such charges would amount to an aggregate sentence of 18 months to 21 years of age. *See* Ohio Rev.Code § 2152.16(d), (e). Ms. Stephenson's affidavit recounts in detail the specifics of the plea offer made by the prosecutor. In addition, petitioner's affidavit supports the conclusion that a plea offer was made. Mr. Carmella does not dispute that an offer was made; he simply does "not recall" or "cannot remember" what happened.

The affidavits of the guardian ad litem and petitioner further establish that the offer was not communicated to petitioner in a timely fashion. Petitioner states that his counsel did not meet with him or communicate the offer to him until *after* his attorney had already rejected the offer. Ms. Stephenson's affidavit is particularly persuasive in this regard given her actions following the prosecutor's initial plea offer. After Ms. Stephenson met with petitioner

and learned of his desire to accept the State's plea offer, she attempted to reach petitioner's counsel. When she was unable, she communicated directly with the prosecutor's office to convey petitioner's desire. However, the plea offer was off the table by that point.

In view of the totality of the evidence presented, the undersigned finds that the State extended a plea offer that was not communicated to petitioner by his counsel and that the first prong of *Strickland* is met.[18]

■ The second *Strickland* prong, the "prejudice requirement," requires a showing of a reasonable probability that the petitioner would have pleaded guilty given competent advice by counsel. *Griffin*, 330 F.3d at 737. In this regard, the Court may consider "that a substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer." *Griffin*, 330 F.3d at 737 (quoting *Dedvukovic v. Martin*, 36 Fed.Appx. 795, 798 (6th Cir. 2002) (unpublished)); *see United States v. Morris*, 470 F.3d 596, 602 (6th Cir.2006) ("This Court has given special weight to significant disparities between the penalties offered in a plea and penalties of a potential sentence in determining whether a defendant suffered prejudice by not accepting a plea offer."); *see also Pham v. United States*, 317 F.3d 178, 182 (2d Cir.

18. The undersigned does not believe an evidentiary hearing is required prior to addressing the merits of petitioner's ineffective assistance of counsel claim based on counsel's failure to convey a plea offer. The affidavits presented do not create an issue of fact as to whether a plea offer was made, and the existing record is sufficient to make a determination on the issue. *See, e.g., Clinkscale v. Carter,* 375 F.3d 430, 445 n. 11 (6th Cir.2004),

cert. denied, 543 U.S. 1177, 125 S.Ct. 1316, 161 L.Ed.2d 162 (2005). *Cf. Hicks v. Timmerman–Cooper,* No. 1:05–cv–774, 2007 WL 2344915 (S.D.Ohio Aug. 16, 2007) (Spiegel, J.) (ordering evidentiary hearing where material factual disputes appeared in record on terms of plea offer and whether petitioner would have accepted offer if communicated by counsel).

2003) (sentencing disparity of at least 113 months and petitioner's statement that he would have accepted the offer is sufficient to support prejudice finding); *Mask v. McGinnis,* 233 F.3d 132, 141–42 (2d Cir. 2000) (large disparity in sentencing exposure coupled with petitioner's statement that he would have accepted reasonable plea offer satisfies prejudice requirement), *cert. denied,* 534 U.S. 943, 122 S.Ct. 322, 151 L.Ed.2d 240 (2001).

The undersigned concludes there is a reasonable probability that petitioner would have accepted the plea offer if timely communicated to him. First, petitioner's affidavit states unequivocally, "If I had been told about this plea offer, I would have accepted it." (Doc. 10, Exh. 43, Exh. B, ¶ 11). Second, the affidavit of petitioner's guardian ad litem confirms that petitioner wished to accept the plea offer. (Doc. 10, Exh. 43, Exh. A, ¶ 7). Third, the disparity between the prison sentence to which petitioner would be subjected under the plea offer and that which he received after his conviction convinces the undersigned that petitioner would have accepted the plea offer had he known about it. The plea offer dismissed the adult component of the charges and carried only a juvenile commitment disposition of a minimum of 18 months and a maximum commitment until age 21. In contrast, a conviction (rather than a juvenile disposition) for murder and child endangerment carried a sentence of juvenile life (eight years) in the Department of Youth Services *and* fifteen years to life imprisonment in an adult prison. Given the substantial disparity between the penalty under the plea offer and the charged offenses, coupled with petitioner's statement that he would have accepted the offer, the undersigned finds that petitioner has established the prejudice prong of the *Strickland* test for his ineffective assistance of counsel claim. Accordingly, the undersigned recommends that a writ of habeas corpus be granted on petitioner's ineffective assistance of counsel claim based on counsel's failure to communicate the plea offer by the State.

### 3. Remedy

█ Pursuant to 28 U.S.C. § 2243, the Court is authorized to dispose of habeas corpus petitions "as law and justice require." This Court has broad discretion in fashioning a judgment granting habeas corpus relief. *Hilton v. Braunskill,* 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). "Cases involving deprivations of the Sixth Amendment right to the assistance of counsel are ... subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation." *Satterlee v. Wolfenbarger,* 374 F.Supp.2d 562, 569 (E.D.Mich. 2005) (citing *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)), *aff'd,* 453 F.3d 362 (6th Cir.2006), *cert. denied,* 549 U.S. 1281, 127 S.Ct. 1832(107), 167 L.Ed.2d 322. The appropriate habeas remedy in this matter involves placing petitioner in the position he would have been but for the ineffective assistance of trial counsel. *Turner v. Tennessee,* 858 F.2d 1201, 1205 (6th Cir.1988), *vacated on other grounds,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), *reinstated,* 726 F.Supp. 1113 (M.D.Tenn. 1989), *aff'd,* 940 F.2d 1000 (6th Cir.1991), *cert. denied,* 502 U.S. 1050, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992). *See also United States v. Allen,* 53 Fed.Appx. 367, 373–74 (6th Cir.2002) ("[I]f it were shown that defense counsel provided ineffective assistance, the remedy is to compel the government to reinstate the prior plea offer, restoring Mr. Allen to where he was before ineffective assistance was rendered."); *Lewandowski v. Makel,* 949 F.2d 884, 889 (6th Cir.1991) ("The only way to effectively repair the constitutional deprivation [the petitioner] suffered is to restore him to the position in which he would have

been had the deprivation not occurred."). Therefore, the plea bargain that had been offered to petitioner by the government prior to trial should be reinstated and petitioner should be re-sentenced in accordance with the terms of the plea agreement. *See Satterlee v. Wolfenbarger*, 453 F.3d 362, 370 (6th Cir.2006) ("Where . . . a defendant receives a greater sentence than one contained in a plea offer that he would have accepted if not for the ineffective assistance of counsel, the properly tailored remedy is to give the defendant the opportunity to accept the offer, because simply retrying the petitioner without making the plea offer would not remedy the constitutional violation that led to the issuance of the writ.").

Thus, if this recommendation is adopted, the Court should grant petitioner's writ of habeas corpus conditioned upon the State of Ohio permitting petitioner to plead guilty to the lesser offenses and under the terms set forth in the pre-trial plea agreement presented by the State.

**B. Was trial counsel ineffective when he failed to consult with and seek the testimony of an expert witness to rebut the testimony of the coroner as to the cause of death?**

Petitioner also asserts trial counsel rendered ineffective assistance of counsel when he failed to make an independent investigation as to the cause of death of the child in order to call his own medical expert to rebut the testimony of the county coroner. The county coroner, Dr. Burkhardt, was present for the autopsy but did not perform the autopsy or prepare the autopsy report. (Doc. 10, Exh. 71, Trial Transcript at Tr. 300). Dr. Burkhardt testified that the child's body contained multiple purple, gray contusions (bruises) of similar age, some superficial abrasions, and healed scars. (Doc. 10, Exh. 71, Trial Transcript at Tr. 305–308).

Internal injuries included a contusion to the head area, hemorrhage (bleeding) in the abdomen area, and a small contusion of the left strap muscle in the neck. (Doc. 10, Exh. 71, Trial Transcript at Tr. 320–321). Dr. Burkhardt opined that the cause of death was a hemorrhage in the pericardial sac which holds the heart. (Doc. 10, Exh. 71, Trial Transcript at Tr. 321). He testified that when the heart ruptures, it bleeds rapidly, no matter how big or small the hole may be. (Doc. 10, Exh. 71, Trial Transcript at Tr. 322). Prior to determining the manner of death, Dr. Burkhardt had not been told that CPR had been improperly attempted on this child. (Doc. 10, Exh. 71, Trial Transcript at Tr. 328). Dr. Burkhardt testified that the improper administration of CPR on the child could result in this type of laceration. (Doc. 10, Exh. 71, Trial Transcript at Tr. 328, 345).

At trial, counsel argued that petitioner's brother Armando actually caused the death of the child by improperly administering chest compressions on the child. Defense counsel also requested and received an intervening cause of death jury instruction: "If the defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was fatal injury inflicted by another person, the defendant who inflicted the original injury is not responsible for the death." (Doc. 10, Exh. 71, Trial Transcript at Tr. 473). Petitioner states that defense counsel did not, however, make an independent investigation of the cause of death in order to call his own medical expert to rebut the testimony of the coroner.

In his post-conviction petition, petitioner presented the report of Dr. Werner Spitz, M.D. After reviewing the available medical evidence, the county coroner's report, the autopsy report, the coroner's diagrams and body photographs, a transcript of the coroner's testimony, and the jury instructions,

Dr. Spitz gave the following opinions regarding the injuries and cause of death of the child:

Based on my review of the circumstances under which this child died, the autopsy report, body diagrams, and autopsy photographs it is evident that Jesus Rodriguez died as a result of laceration of the heart which caused bleeding into the heart sac and tamponade. The injury of the heart was in my opinion the result of chest compressions during attempted resuscitation. The front of the right atrium, adjacent to the a trial appendage, showed a 3/4″ long horizontal laceration. Besides being one of the thinnest parts of the heart, this area of the heart is situated immediately behind the chest plate and strong pressure on the chest plate would crush this area against the spine. A bruise in the root of the mesentery which suspends the small bowel, is situated in close proximity of the spine and the heart, was caused in the same way. No trauma is noted to the anterior chest wall and the upper abdominal wall, except for 1/4″ bruises consistent with CPR. Bruises and abrasions on the back are consistent with floor contact and a single bruise in the musculature of the left side of the neck is consistent with a therapeutic needle mark at the emergency room where an IV line was established in this site. Two bruises on the left side of the lower jaw and one on the right side are consistent with finger tip pressure from holding the lower jaw during resuscitative efforts.

(Doc. 10, Exh. 43, Exh. D). Dr. Spitz opined that based on the totality of the findings, the child died accidentally from improperly administered CPR. Dr. Spitz stated:

I find no evidence of strikes or blows inflicted to this child, nor do I find any type of trauma indicative of strangulation, smothering or neck hold. *No death causing injuries are described in the autopsy report, except as indicated in the Butler County Coroner's report whereby the death resulted from a laceration of the heart which produced bleeding into the heart sac and cardiac tamponade.*

(Doc. 10, Exh. 43, Exh. D) (emphasis in the original).

The sole cause of death identified by the coroner and Dr. Spitz was a laceration to the heart. Petitioner argues that the laceration to the heart was inflicted by Armando when he improperly performed chest compressions on the child. (Doc. 10, Exh. 71, Trial Transcript at Tr. 267, 282). If there was an intervening cause of death, petitioner would not be deemed responsible for the death of the child.

Petitioner asserts that trial counsel had an affirmative duty to procure an expert to rebut the State's theory as to cause of death. Had counsel procured such expert evidence, the jury would have been apprised of medical facts that supported a different theory as to the cause of death. When Dr. Burkhardt testified differently at trial than to what he had told counsel during a pre-trial interview, it "never occurred to" trial counsel to ask for a continuance in order to consult with and seek the testimony of an independent medical expert. (Doc. 10, Exh. 43, Exh. E, Carmella Affidavit at ¶ 8; Doc. 21, attachment). Petitioner contends the evidentiary change in Dr. Burkhardt's testimony should have prompted counsel to seek an expert to present the defense theory and that counsel's failure to investigate and procure expert evidence that offered a plausible explanation for the most damaging elements of the State's case constituted ineffective assistance of counsel. (Doc. 19 at 25–29).

In addressing petitioner's ineffective assistance of counsel claim on the post-con-

viction petition, the Ohio Court of Appeals stated:

{¶ 34} With regard to appellant's fifth ground for relief (failure to call an expert witness to rebut the coroner's testimony), we note that in his petition, appellant acknowledged that his trial attorney argued, during cross-examination of the coroner, and throughout the trial, that a sibling of appellant actually caused the death of the victim when he improperly performed chest compressions on the victim, and that trial counsel asked and received an intervening cause of death jury instruction. On direct appeal, appellant specifically argued that his trial counsel was ineffective for failing to call any defense witnesses. In addressing this argument, we held that the decision of appellant's trial counsel not to call an expert witness and to rely instead on the cross-examination of the coroner was a matter of sound trial strategy which did not constitute ineffective assistance of counsel. We noted that "the record shows that appellant effectively cross-examined [the coroner], who testified that it was 'possible' that chest compressions administered by an inexperienced person caused the victim's death." *In re J.B.*, 2005–Ohio–7029, ¶ 101–102 [2005 WL 3610482].

{¶ 35} In his affidavit, trial counsel simply stated it did not occur to him to ask for a continuance to consult with and seek the testimony of an expert witness after the coroner's testimony differed from what he told the attorney during an interview. The affidavit does not indicate in what respect the coroner's testimony differed. Although, through Dr. Spitz's affidavit, we now know exactly what a defense expert could have testified to at trial, this information does not change the fact that decisions to call a witness are within the purview of trial counsel's trial tactics. See *State v. Lug-*

*li*, Erie App. No. E–01–032, 2003–Ohio–479 [2003 WL 220595]. Upon reviewing Dr. Spitz's affidavit and trial counsel's thorough and effective cross-examination of the coroner as to whether chest compressions could have caused the victim's death, we cannot say that trial counsel's performance fell below an objective standard of reasonableness when he failed to call an expert witness. Appellant is barred from raising this issue in his petition.

(Doc. 10, Exh. 58 at 13–14).

 In order to establish a Sixth Amendment violation under *Strickland,* petitioner must first demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. 466 U.S. at 688, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time of the conduct. *Id.* at 689, 104 S.Ct. 2052. In determining whether or not counsel's performance was deficient, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052.

In the representation of a criminal defendant, counsel has a duty to conduct a reasonable investigation:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent

that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

■■■ A lawyer's duty "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir.2005). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000); *accord Towns,* 395 F.3d at 258. "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns,* 395 F.3d at 258 (quoting *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991)). The deference owed to counsel's strategic decisions is dependent upon the adequacy of the investigation underlying such decisions. *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The question is not whether counsel's failure to call an expert witness was unreasonable, but whether the investigation supporting the decision not to call an expert witness was

itself reasonable. *Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527.

"A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." *Richey v. Bradshaw,* 498 F.3d 344, 362 (6th Cir.2007) (quoting *Reynoso v. Giurbino,* 462 F.3d 1099, 1112 (9th Cir.2006)). In *Richey,* an arson prosecution, the Sixth Circuit held counsel's performance was deficient where counsel "did next to nothing to determine if the State's arson conclusion was impervious to attack." *Id.* at 362. The scientific evidence on the issue of arson was central to the prosecution's case and counsel knew there were gaps in the State's proof of arson. Even though Richey's counsel hired an expert, he failed to consult with that expert to make an informed decision about the viability of a "no arson" defense. In his post-conviction petition, the petitioner introduced competing scientific evidence showing the flaws in the State expert's methodology and that the fire likely started accidentally, the evidence "his counsel would have learned about the State's arson evidence and how to countermand that evidence, had his counsel performed effectively." *Richey,* 498 F.3d at 360. The Court of Appeals determined that counsel's strategy merely to "poke holes in the State's arson case" was insufficient and that counsel had an affirmative duty to investigate the scientific bases for the State's expert's opinion. *Richey,* 498 F.3d at 363.[19]

---

**19.** *See also Wiggins v. Smith,* 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (stating that *"Strickland* does not establish that a cursory investigation automatically justifies a tactical decision"); *Dugas v. Coplan,* 428 F.3d 317, 328 (1st Cir.2005) (holding that where defense counsel visually inspected the fire scene himself, talked with the state's experts, did some limited reading, and talked

with other defense attorneys, he nonetheless failed to adequately investigate an available "no arson" defense); *Driscoll v. Delo,* 71 F.3d 701, 709 (8th Cir.1995) (holding that even where defense counsel elicited a concession from the state's expert that whether a particular blood type was on a knife was entirely speculative, defense counsel was defective for having failed to take measures "to understand

■ In the instant case, counsel's affidavit states he "did not believe an independent witness was necessary to rebut" the testimony of the doctors from the county coroner's office after he interviewed the two doctors. (Doc. 10, Exh. 43, Exh. E at ¶ 8). However, there is no explanation or evidence of the factors or considerations underlying counsel's belief that he did not need to call an independent witness. There is no evidence that counsel had prior experience in similar cases or special knowledge to enable him to evaluate the competency and strength of the forensic evidence to be presented by the State. "It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field." *Duncan v. Ornoski,* 528 F.3d 1222, 1235 (9th Cir.2008) (citing *Dugas v. Coplan,* 428 F.3d 317, 331 (1st Cir.2005)). There is no evidence that counsel consulted with any medical personnel or even other attorneys in evaluating the coroner's evidence. Here, the Court is without sufficient information to determine whether defense counsel's decision not to call an expert witness at trial was in fact "trial strategy" made after a reasonable investigation of the facts under the circumstances. The opinion of the county coroner was critical to the question of the cause of death and to the State's case. The potentially exculpatory expert evidence that defense counsel did not investigate could have played a central role in petitioner's defense. There is no indication from the record that counsel made any attempt to investigate whether the cause of death evidence could have been challenged.

The fact that counsel may have mounted an "effective" cross-examination by eliciting testimony from the coroner that it was "possible" that improperly administered chest compressions caused the victim's

death, as the state court found, does not answer the question of what investigation led up to counsel's decision to rely on cross-examination alone, and to not call an expert witness. *See Dickerson v. Bagley,* 453 F.3d 690, 696 (6th Cir.2006) (trial counsel's "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence."). The Court must evaluate counsel's choices in light of the investigation that led to those choices to determine whether such choices were in fact "strategic." *Cf. Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527 ("[O]ur principal concern ... is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable.*" ) (emphasis in the original). Dr. Spitz's report that the cause of death was in fact improperly administered chest compressions merely highlights the potential inadequacy of counsel's investigation into whether he should have called his own defense expert. Then, when counsel was confronted at trial with unanticipated testimony from the coroner, "[i]t never occurred to [counsel] to ask for a continuance in order to consult with and seek the testimony of an independent medical expert." *Id.* This evidence further suggests that counsel may not have adequately explored whether expert assistance was necessary in mounting the defense.

Without further information on counsel's underlying investigation, the Court is without sufficient evidence to determine the reasonableness of the state court of appeals' determination that counsel's failure to call an expert witness to rebut the

the laboratory tests performed and the inferences that one could logically draw from the

results") (all cited with approval in *Richey,* 498 F.3d at 363).

coroner's cause of death evidence was a matter of "sound trial strategy." If counsel failed to conduct an adequate investigation into the child's cause of death, then counsel violated his duty to conduct a reasonable, diligent investigation of the case. *See Wiggins,* 539 U.S. at 522, 123 S.Ct. 2527. Contrary to the state appellate court's conclusion that counsel's decision amounted to trial strategy, the record before the Court strongly suggests that counsel's failure to seek expert assistance was deficient under the circumstances. *See, e.g., Duncan v. Ornoski,* 528 F.3d 1222, 1235 (9th Cir.2008) (failure to consult a serologist when there existed potentially exonerating blood evidence, to have defendant's blood tested, and to present results of those tests at trial were unreasonable under prevailing professional norms); *Miller v. Anderson,* 255 F.3d 455, 457–59 (7th Cir.2001) (finding deficient performance when counsel failed to hire an expert to rebut the prosecution's expert testimony about physical evidence linking defendant to the crime scene when the defense theory was that defendant was not at the crime scene), *remand order by stipulation,* 268 F.3d 485 (7th Cir.2001) (vacated at request of parties when settlement reached); *Troedel v. Wainwright,* 667 F.Supp. 1456, 1461 (S.D.Fla.1986) (counsel's failure to depose State's expert and failure to consult with an expert in order to contradict key evidence of "most crucial aspect of the trial" were deficient), *aff'd, Troedel v. Dugger,* 828 F.2d 670 (11th Cir.1987) (per curiam).

Had counsel sought the testimony of an expert witness such as Dr. Spitz, and had his testimony been presented to the jury, there is a "reasonable probability" that, but for his counsel's errors, the result of the trial and appeal proceedings would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. If defense counsel presented evidence that the cause of death was improperly administered chest compressions, the outcome of the guilt phase

may likely have been different since the evidence at trial showed petitioner's brother was the only one who administered chest compressions to the child. This is especially true given Dr. Burkhardt's testimony that he had not been told that CPR had been administered on the child and that the improper administration of CPR could result in the type of laceration to the heart which occurred to the child.

The question before the Court is not one of the sufficiency of the evidence, but whether the evidence pointing to a cause of death other than the reckless abuse of a child would undermine confidence in the reliability of the result of petitioner's trial. *Richey,* 498 F.3d at 364. If confronted with evidence of a different cause of death, the jury may have had a reasonable doubt about petitioner's guilt.

Given the concerns outlined above on this claim, it appears that an evidentiary hearing is required to develop the facts underlying petitioner's ineffective assistance of counsel claim before this Court can adjudicate the merits of such claim. Pursuant to 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the [United States] Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder

would have found the applicant guilty of the underlying offense.

In *Williams v. Taylor*, 529 U.S. 420, 432, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), the Supreme Court held that "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." In so ruling, the Court observed that the "opening clause of § 2254(e)(2) codifies the threshold standard of diligence" previously established by the Supreme Court in *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), applicable to "prisoners who are at fault for the deficiency in the state-court record [to] ... satisfy a heightened standard to obtain an evidentiary hearing." *Williams*, 529 U.S. at 433–34, 120 S.Ct. 1479.

■■■ Diligence within the meaning of the "opening clause" of § 2254(e)(2) "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend ... upon whether those efforts could have been successful." *Williams*, 529 U.S. at 435, 120 S.Ct. 1479; *see also Satterlee v. Wolfenbarger*, 374 F.Supp.2d 562 (E.D.Mich.2005), *aff'd & remanded on other grounds*, 453 F.3d 362 (6th Cir.2006), *cert. denied*, 549 U.S. 1281, 127 S.Ct. 1832, 167 L.Ed.2d 322 (2007). Therefore, a petitioner who was diligent in seeking a state evidentiary hearing, but whose requests were denied in the state courts, has not failed to develop the facts underlying his claim, and "will be excused from showing compliance with the balance of [§ 2254(e)(2)'s] requirements." *Williams*, 529 U.S. at 437, 120 S.Ct. 1479; *see also McFarland v. Yukins*, 356 F.3d 688, 712 (6th Cir.2004); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir.2001), *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

Here, petitioner was diligent in seeking to develop the facts underlying his remaining ineffective assistance of counsel claim which he presented in his state court post-conviction petition and supporting affidavits. *Cf. McFarland*, 356 F.3d at 712; *Greer*, 264 F.3d at 681.[20] Petitioner presented this claim at the first available opportunity to the state courts. Therefore, the heightened standard set forth in 28 U.S.C. § 2254(e)(2) is inapplicable.

The district court has the discretion and "inherent authority" in habeas cases "to order evidentiary hearings to settle disputed issues of material fact." *Sawyer v. Hofbauer*, 299 F.3d 605, 609–10 (6th Cir. 2002) (quoting *Abdur'Rahman v. Bell*, 226 F.3d 696, 706 (6th Cir.2000), *cert. denied*, 534 U.S. 970, 122 S.Ct. 386, 151 L.Ed.2d 294 (2001)); *see also Harries v. Bell*, 417 F.3d 631, 635 (6th Cir.2005). Because § 2254(e)(2) does not apply here, petitioner is entitled to such a hearing if it is determined that he has alleged "sufficient grounds for release, [the] relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing" on his claims. *Id.* at 610–11 (quoting *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir.2001), *cert. denied*, 537 U.S. 831, 123 S.Ct. 136, 154 L.Ed.2d 47 (2002)).

In this case, it is clear from the record presented that petitioner was not afforded a full and fair evidentiary hearing on his

---

**20.** *See also Hall v. Russell*, No. 1:02–CV–34, 2006 WL 1982856, at *3 (S.D.Ohio July 13, 2006) (unpublished) (Spiegel, S.J.) (remanding for evidentiary hearing on claim that the "government withheld evidence in [petitioner's] favor, and destroyed such evidence," after finding that petitioner did "not fall within [§ ] 2254(e)(2)'s opening clause" because he was not at "fault" in failing to develop the facts underlying such claim in the state courts).

ineffective assistance of counsel claim in the state courts. The trial court denied the claims alleged in petitioner's post-conviction petition without holding an evidentiary hearing, and that decision was affirmed on appeal.

The undersigned also concludes that petitioner has alleged facts, which if true, could entitle him to habeas relief. For the reasons outlined above, petitioner has raised a colorable claim that he was denied his Sixth Amendment right to the effective assistance of counsel when his trial attorney failed to investigate and procure expert evidence on the cause of death. The undersigned further concludes that because the state courts did not afford petitioner a full and fair evidentiary hearing on this ineffective assistance of counsel claim, the material facts have not been sufficiently developed for the Court to adequately assess the merits of such claims.

Accordingly, it is recommended that the Court exercise its discretion to order that an evidentiary hearing be held, wherein the State and petitioner's counsel are provided the opportunity to respond to petitioner's evidence in support of his claim that his trial counsel was ineffective in failing to investigate and procure expert evidence on the cause of death. *See* Rule 8, Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.[21]

## VI. WAS PETITIONER DENIED DUE PROCESS AND TRIAL BY JURY IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS ALLEGED IN GROUND FOUR OF THE PETITION?

Ground Four of the petition alleges that petitioner was denied due process of law and trial by jury because the trial court made certain mandatory statutory findings before imposing a sentence greater than the maximum term authorized by the jury verdict, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Petitioner asserts that the imposition of his adult sentence under the serious youthful offender statute was based on judicial factfinding in violation of clearly established federal law as determined by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348.

The Supreme Court in *Blakely* reaffirmed *Apprendi* and held that an enhanced sentence imposed by a judge under a state's sentencing statute, which was based on facts neither admitted by the defendant nor found by a jury, violated the Sixth Amendment to the United States Constitution. The defendant in *Blakely* entered a guilty plea and, pursuant to the plea agreement, the state recommended a sentence within the standard range of 49 to 53 months. *Id.* at 300, 124 S.Ct. 2531. The trial judge rejected the recommended sentence and, instead, imposed an exceptional sentence of 90 months based upon his own finding, by a preponderance of the evidence, that the defendant had acted with "deliberate cruelty." 542 U.S. at 302–304, 124 S.Ct. 2531. The Supreme Court reversed the defendant's sentence imposed under the state's determinate sentencing scheme after finding the trial judge had enhanced the defendant's kidnaping sentence beyond the statutory maximum

---

**21.** In the event the District Judge adopts the recommendation that a writ of habeas corpus be issued on Ground Two of the petition, an evidentiary hearing may not be necessary.

based upon facts neither admitted to by the defendant nor found by the jury. *Id.* at 303, 124 S.Ct. 2531. The Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely,* 542 U.S. at 303, 124 S.Ct. 2531. The Supreme Court clarified:

> [T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* .... In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

542 U.S. at 303–304, 124 S.Ct. 2531 (internal citations omitted) (emphasis in the original).

In this case, petitioner received a "blended" sentence under the serious youthful offender statute, Ohio Rev.Code §§ 2152.11, 2152.13. Petitioner was committed to the custody of the Department of Youth Services until the age of 21 and received an adult sentence under the serious youthful offender statute of concurrent terms of fifteen years to life for murder and two years for child endangering. The court stayed the serious youthful offender portion of the sentence pending the successful completion of petitioner's juvenile sentence. (Doc. 10, Exh. 15).

The Supreme Court of Ohio recently explained the operation of the serious youthful offender statutory scheme:

> A juvenile charged as a potential serious youthful offender does not face bindover

to an adult court; the case remains in the juvenile court. Under R.C. 2152.11(A), a juvenile defendant who commits certain acts is eligible for "a more restrictive disposition." That "more restricted disposition" is a "serious youthful offender" disposition and includes what is known as a blended sentence-a traditional juvenile disposition coupled with the imposition of a stayed adult sentence. R.C. 2152.13. The adult sentence remains stayed unless the juvenile fails to successfully complete his or her traditional juvenile disposition. R.C. 2152.13(D)(2)(a)(iii). Theoretically, the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning as both carrot and stick.

*State v. D.H.,* 120 Ohio St.3d 540, 544, 901 N.E.2d 209, 212–13 (2009). If the juvenile offender fails to successfully complete the traditional juvenile disposition, the juvenile court may invoke the adult portion of the sentence after certain findings made by clear and convincing evidence after a hearing. *Id.* at 545–46, 901 N.E.2d at 214 (citing § 2152.14(E)).

The statute sets forth a combination of factors, such as age and seriousness of the offense, in determining whether a juvenile will face a traditional juvenile disposition, a "mandatory" serious youthful offender disposition, or a "discretionary" serious youthful offender disposition. *D.H.,* 120 Ohio St.3d at 544, 901 N.E.2d at 213. In the instant case, petitioner was eligible for a "discretionary" blended sentence based on his age, thirteen, and the seriousness of his offenses "if committed by an adult." *See* Ohio Rev.Code §§ 2152.11(B)(2),[22]

---

**22.** Section 2152.11(B)(2) provides, "If a child is adjudicated a delinquent child for committing an act that would be aggravated murder or murder if committed by an adult, the child

is eligible for ... (2) Discretionary SYO, if the act was committed when the child was ten, eleven, twelve, or thirteen years of age."

(E)(2).[23]

Under the applicable statutory provision, a juvenile court must make certain findings before imposing a "discretionary" blended sentence:

If the juvenile court on the record makes a finding that, given the nature and circumstances of the violation and the history of the child, the length of time, level of security, and types of programming and resources available in the juvenile system alone are not adequate to provide the juvenile court with a reasonable expectation that the purposes set forth in section 2152.01 of the Revised Code will be met, the juvenile court may impose upon the child a sentence available for the violation, as if the child were an adult, under Chapter 2929. of the Revised Code, except that the juvenile court shall not impose on the child a sentence of death or life imprisonment without parole.

Ohio Rev.Code § 2152.13(D)(2)(a)(i).

Petitioner argues that without the additional findings specified in § 2152.13(D)(2)(a)(i), a juvenile court may not impose the adult portion of the blended sentence and the maximum sentence a juvenile may receive is commitment to the Department of Youth Services until the age of 21. Petitioner argues his blended sentence violates his Sixth Amendment right to trial by jury and *Blakely* because the juvenile court judge, and not a jury, made these findings of fact.

In addressing this assignment of error on appeal, the Ohio Court of Appeals stated:

{¶ 124} In this assignment of error, appellant argues that because the court and not the jury made the serious youth-

ful offender finding under R.C. 2152.13(D)(2)(a)(i), his constitutional right to a jury trial was violated. For support, appellant cites *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531 [159 L.Ed.2d 403], and *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348 [147 L.Ed.2d 435]. {¶ 125} In *Apprendi,* the U.S. Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* at 490 [120 S.Ct. 2348]. In *Blakely,* the Supreme Court held that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" (Emphasis sic.) *Blakely* at 303 [124 S.Ct. 2531]. The *Blakely* court held that a sentence imposed based on facts not before the jury or admitted by the offender violated the offender's federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. *Id.* at 313 [124 S.Ct. 2531].

{¶ 126} Appellant's right to a jury trial was not violated due to the juvenile court judge making the finding in R.C. 2152.13(D)(2)(a)(i). The sentence appellant received was derived from the jury's verdict on the murder and child endangering counts, not from any additional fact finding engaged in by the juvenile court. Pursuant to R.C. 2152.11(B)(2) and R.C. 2152.11(E)(2), appellant was subject to a serious youthful offender disposition at the discretion of

---

**23.** Section 2152.11(E)(2) provides, "If a child is adjudicated a delinquent child for committing an act that would be a felony of the second degree if committed by an adult, the child is eligible for ... (2) Discretionary SYO, if the act was committed when the child was twelve or thirteen years of age, and the act is enhanced by any factor described in division (A)(1), (2), or (3) of this section."

the juvenile court simply by virtue of the delinquency finding for murder and child endangerment. Therefore, the range of appellant's potential punishment by virtue of the jury verdict alone included the applicable adult punishment set forth in Revised Code Chapter 2929. In making the finding in R.C. 2152.13(D)(2)(a)(i), the court was determining appellant's punishment within the statutorily prescribed range, taking into account the nature and circumstances of the offense, and the security, programming, and resources available in the juvenile system. The court's consideration of those matters did not violate appellant's right to a jury trial. See *State v. Combs*, Butler App. No. CA2000–03–47, 2005–Ohio–1923, ¶ 59 [2005 WL 941133], and *State v. Farley*, Butler App. No. CA2004–04–085, 2005–Ohio–2367, ¶ 42 [2005 WL 1131745] (consideration of discretionary sentencing factors by judge did not violate offender's right to jury trial where sentence imposed was within statutorily defined range for offense).

(Doc. 10, Exh. 31 at 35–36).

Petitioner contends the state appellate court unreasonably applied controlling Supreme Court precedent to petitioner's case because there is no principled distinction between the unconstitutional judicial fact-finding in *Apprendi* and *Blakely*, and the judicial fact-finding required by Ohio's discretionary serious youthful offender statute. The undersigned disagrees. The rehabilitative goals underlying the juvenile justice system distinguish the fact-finding required in the disposition of juvenile offenders from the sentencing of adult defendants. In this regard, the undersigned is persuaded by a recent decision of the Supreme Court of Ohio which upheld the discretionary serious youthful offender statute against a *Blakely* challenge as meeting the fundamental fairness requirements of the Due Process Clause.

In *State v. D.H.*, 120 Ohio St.3d 540, 901 N.E.2d 209 (2009), the Supreme Court of Ohio held that "R.C. 2152.13(D)(2)(a)(i), which requires a juvenile court judge to consider certain factors before imposing a serious-youthful-offender dispositional sentence, does not violate the Sixth Amendment to the United States Constitution or Sections 5 and 10, Article I of the Ohio Constitution." *Id.* at syllabus, ¶ 1. The Supreme Court of Ohio recognized that juvenile proceedings are fundamentally different from adult criminal trials because of the State's interest in the rehabilitation of the juvenile offender and the paternal role it plays in the juvenile justice scheme. *D.H.*, 120 Ohio St.3d at 548, 901 N.E.2d at 216 (citing *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Unlike the statutory purpose behind adult criminal sentencing, to punish the offender and protect the public, the overriding goal of juvenile dispositions is "to provide for the care, protection, and mental and physical development of children . . ., protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." *D.H.*, 120 Ohio St.3d at 549, 901 N.E.2d at 216–17 (citing Ohio Rev.Code § 2152.01(A)). In recognition of these differences, the Ohio Supreme Court noted that juvenile delinquency proceedings have not been considered "criminal prosecutions" within the meaning of the Sixth Amendment and that offenders in juvenile proceedings do not have a federal constitutional right to a jury trial. *Id.* at 547–48, 901 N.E.2d at 215 (citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion)). A juvenile's rights in delinquency proceedings stem from the Due Process Clause and not the Sixth Amendment. *Id.*; *see also In re Gault*, 387 U.S. 1, 30–31, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

Employing the due process standard of "fundamental fairness" governing the procedures and rights of juveniles in delinquency proceedings, *McKeiver*, 403 U.S. at 543, 91 S.Ct. 1976; *In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault*, 387 U.S. at 30–31, 87 S.Ct. 1428; *Kent v. United States*, 383 U.S. 541, 553, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Ohio Supreme Court determined that Ohio's blended sentencing scheme for serious juvenile offenders satisfies due process requirements. The Court reasoned:

{¶ 56} Should a juvenile exercise his right to a jury under R.C. 2152.13(C)(1), that jury will determine whether the juvenile did, in fact, commit the acts he is accused of. The determination of guilt-whether the defendant committed these acts-is little different from a jury's determination in a case involving an adult tried in a criminal court. The General Assembly has decided that a juvenile deserves a jury in that fact-finding role....

\*

\*

\*

{¶ 58} The jury plays an important role in the adjudicative portion of Ohio's serious-youthful-offender disposition statutory scheme. Only the jury's factual determination makes the juvenile defendant eligible for a disposition that might include a stayed adult sentence.

{¶ 59} Despite the jury's role in the adjudicative phase, removing the jury from the dispositional process does not violate due process. *The court's dispositional role is at the heart of the remaining differences between juvenile and adult courts. It is there that the expertise of a juvenile judge is necessary.* The judge, given the factors set forth in R.C. 2152.13(D)(2)(a)(i), must assess the strengths and weaknesses of the juvenile system vis-à-vis a particular child to determine how this particular juvenile fits within the system and whether the system is equipped to deal with the child successfully. That assessment requires as much familiarity with the juvenile justice system as it does familiarity with the facts of the case. To leave that determination to an expert, given the juvenile system's goal of rehabilitation, does not offend fundamental fairness, especially since the adult portion of the blended sentence that the judge imposes upon a jury verdict is not immediately, and may never be, enforced.

*D.H.*, 120 Ohio St.3d at 550, 901 N.E.2d at 217 (emphasis added).

 The undersigned is in full agreement with the reasoning of the Supreme Court of Ohio in *D.H.* and determines that the Ohio Court of Appeals' decision rejecting petitioner's *Blakely* claim in the instant case was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

As explained above, petitioner had no Sixth Amendment right to a jury trial in his juvenile court proceeding. *McKeiver*, 403 U.S. at 545, 91 S.Ct. 1976. While petitioner exercised his statutory right to a jury trial under Ohio law, the jury made the critical factual findings which ultimately exposed petitioner to a potential blended sentence. These findings included his age at the time of the offense and that he committed the acts supporting a guilty finding on the murder and child endangerment charges. *See* Ohio Rev.Code §§ 2152.11(B)(2), (E)(2). Once the jury determined petitioner was guilty of murder and child endangerment, he was then eligible for a discretionary serious youthful offender disposition, *i.e.*, a range of punishment solely determined by the jury's verdict. In other words, "the jury's finding

beyond a reasonable doubt that a child committed the offenses that form the foundation permitting the court to sentence the child as an adult" satisfies the constitutional concerns expressed in *Apprendi* and *Blakely. State v. Gonzales,* 130 N.M. 341, 349, 24 P.3d 776, 784 (N.M.App.2001). The juvenile court judge's findings under § 2152.13(D)(2)(a)(i) were based on discretionary factors wholly appropriate to and within the expertise of the judge—the strengths and weaknesses of the available facilities and programs within the juvenile system as well as the prospect of such resources in meeting the rehabilitative goals of the juvenile justice system for this particular juvenile offender. These predictive factors are distinct from the findings of historical facts traditionally made by juries in the sentencing of adult defendants as in *Apprendi* and *Blakely. See Gonzales v. Tafoya,* 515 F.3d 1097, 1112–14 (10th Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 211, 172 L.Ed.2d 156 (2008). The juvenile court's exercise of its discretion in light of these factors in crafting a blended sentence to best meet the needs of this particular juvenile offender does not violate petitioner's right to a jury trial.

Accordingly, petitioner is not entitled to habeas corpus relief based on the *Blakely* claim alleged in Ground Four of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1. A writ of habeas corpus be issued on Ground Two of the petition unless petitioner is granted a new trial within a time to be fixed by the district judge.

2. A writ of habeas corpus be granted on petitioner's ineffective assistance of counsel claim based on counsel's failure to convey the plea offer to petitioner as alleged in Ground Six of the petition conditioned upon the State of Ohio permitting petitioner to plead guilty to the lesser offenses and under the terms set forth in the pre-trial plea agreement presented by the State.

3. The Court exercise its discretion to order that an evidentiary hearing be held, wherein the State and petitioner's counsel are provided the opportunity to respond to petitioner's evidence in support of his claim that his trial counsel was ineffective in failing to investigate and procure expert evidence on the cause of death as alleged in Ground Six of the petition.

4. Ground Four of the petition for writ of habeas corpus be denied with prejudice. However, a certificate of appealability should issue with respect to Ground Four of the petition because reasonable jurists would find it debatable whether that claim should have been resolved in a different manner or, alternatively, whether the issue presented is "adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)); *see also* 28 U.S.C. § 2253(c); Fed. R.App. P. 22(b).

5. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, should **GRANT** petitioner leave to proceed on appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R.App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir.1997).